No. 2675.

LEE CONNER *v.* THE STATE.

1. THEFT—EVIDENCE—POSSESSION—VARIANCE.—The indictment charged the possession and ownership of the alleged stolen horse to be in one J. C. B. The proof showed that the animal was taken by the accused from a place at which one Bull had hoppled it by direction of D. H. B., who had borrowed the horse from J. C. B. *Held,* that the proof established the possession in D. H. B., and that the variance between the allegation and proof on the issue of possession is fatal to the conviction.

2. SAME—CONSENT.—The proof showed that, for the purpose of detecting the accused in the very act of theft, the horse was hoppled with the expectation and the intent that defendant would take him. It was contended by the defense that the proof established a taking with the consent of the owner. *Held,* that the position is without merit, as the owner in no way suggested the theft to the accused nor induced him to commit it.

3. SAME—ASPORTATION.—Neither asportation nor actual manual possession of the property is, under our code, essential to constitute theft.

APPEAL from the District Court of Coleman. Tried below before the Hon. J. C. Randolph.

The conviction in this case was for the theft of a horse, the possession and ownership of which was alleged to be in one J. C. Benton. A term of five years in the penitentiary was the penalty assessed by the verdict.

J. L. Nickel was the first witness for the State. He testified, in substance, that in June, 1886, he lived in the Rough creek neighborhood, in Coleman county, Texas. On two or three different occasions, prior to the commission of the act for which the defendant was now upon trial, the defendant came to the witness and requested the witness to join him in the business of stealing horses and running them off to Lampasas county and selling them. Defendant said that sleek horses, worth seventy-five dollars each, could be stolen and sold to a good profit. Witness declined to join the defendant in the proposed enterprise. Some time in May, 1886, witness went to defendant and told him that he had lost two horses, which had either strayed or been stolen, and asked the defendant to go with him in search of the said horses. Defendant replied: "I know of a way we can do to beat that, and in which you can get even for the loss of your horses. We can steal a couple of horses, which will make up your loss, and be easier than hunting the horses you have lost." Defendant then proposed to steal the horses of the witness's brother-in-law. The witness then went to Mr. E. A. Birdwell and told him of the proposition made to him by the defendant to go into the horse stealing business. Birdwell advised the witness to agree to the next proposition of the kind made by the defendant, and to apprise him, so that he and others might take the defendant in the very act. On the morning of June 15, 1886, the witness went to the defendant's house, and the defendant renewed his proposition, and the witness, acting upon the suggestion of Birdwell, agreed. Defendant borrowed a saddle and rode a mule to the Rough creek bottom, to look for some horses to steal, witness accompanying him, not for the purpose of participating in the theft, but in pursuance of the agreement he had made with Birdwell. They found two horses hoppled out, one a sorrel, branded JAC, and one a gray, branded BA. Witness

and defendant examined those horses, and defendant said that they would do. Witness and defendant laid around the horses all day, at a point about two hundred yards distant. Defendant went to and closely examined the said horses two or three times during the said day. He asked witness during the day if the witness knew who owned the said horses, and witness replied truthfully that he did not. During the day the witness saw Mr. Bull, and went to him and asked him: "Ain't you on to the racket?" About dusk the bell on one of the horses got to ringing, and defendant remarked: "There they are." The witness and defendant rode to a point near the horses, when the defendant dismounted, with a rope in his hand, and went to the first horse, which he caught, but released. He then dropped his rope, caught the other horse around the neck, patted him and rubbed him down gradually towards the hopples on his feet. He was in the act of removing the hopples, when the men in ambush ordered him to hold up his hands. Defendant responded to the order with the exclamation "Oh!" The men then came in view, and were Bull, Birdwell, Townsend and Dave Benton. Defendant told them that the horses belonged to his uncle, and that if he could go to Buffalo Gap he would prove it. The men then asked him who owned the rope lying near. He first said that he did not know, but afterwards said that it was his.

R. C. Bull testified, for the State, that on or about June 15, 1886, two horses, belonging to J. C. Benton, were placed in his hands to be used as decoys in the detection of the defendant for horse theft. According to arrangements previously made, the witness took the said horses to a certain point in the Rough creek bottom and hoppled them out. He then secreted himself in the vicinity and watched them. He saw the defendant and Nickel when they arrived on the ground. About dusk A. P. Townsend joined witness, and they secreted themselves behind some rocks not far from the horses. Defendant and Nickel soon came to the horses. Defendant went to the nearest horse, dropped his rope, and took the horse around the neck, but soon released him. He then went to the second horse, and was in the act of unhoppling him, when the witness stepped from his covert and ordered him to hold up his hands. Defendant exclaimed "Oh!" throwing up his hands, and then said that the horses belonged to his uncle, Jack Coggins. Witness asked defendant who owned the rope. He replied first that he did not know, but afterwards said that he did. The horses were on their accustomed range, but were

hoppled there to enable defendant to steal them, under an arrangement with Nickel to apprehend him in the act.    On his cross examination, the witness said that the horses belonged to J. C. Benton, but were delivered to him by D. H. Benton, J. C's. brother, for the uses to which they were put.    Witness had the care and control of the horses during the day.    Witness passed the defendant and Nickel at one time during the day.

D. H. Benton testified, for the State, that he was a party to the plan devised for the detection of the defendant in the act of stealing horses.    On the night of June 14 he went to his brother, J. C. Benton, and asked the loan of the two horses.    His brother told him to take them.    He did not tell his brother his object in borrowing the horses.    He turned the horses over to Bull on the morning of the fifteenth for the purpose of hoppling them in the flat where the defendant could find and steal them.    They were placed there by Bull with the intent and expectation that defendant would steal them.    Witness joined Bull, Townsend and others in the flat after the arrest of defendant.    Witness did not give defendant his consent to take the horses.

A. P. Townsend testified, for the State, that on June 15, 1886, Mr. Bull told him that defendant and Nickel were preparing to steal some horses, and divulged to him the scheme adopted to detect defendant in the very act.    Witness joined Bull and staid with him until the arrest was made.    He detailed the circumstances of the theft exactly as Bull did.

J. C. Benton testified, for the State, that his brother Dave came to him on the night of June 14, 1886, and asked the loan of his two horses.    He did not say what he wanted with them nor how long he wanted them.    Witness told him to take them, and considered he had lent them for an indefinite period.    Witness did not then know what his brother wanted with the horses.    He did not consent that defendant should take them.

E. A. Birdwell testified, for the State, that he was a party to the scheme devised to detect the defendant.    That scheme was formulated upon information given to witness by Nickel that defendant had proposed to him to embark in the horse stealing business.

The State closed.

Mrs. M. M. Conner testified, for the defense, that on the morning of June 15, 1886, Nickel came to her house and asked her son Lee, the defendant, if he could go with him to help hunt his horses, and offered to pay him a dollar a day.    Defendant replied

that he had no horse to ride, but that, if he knew where he could find any of his uncle's horses, he would go. Nickel asked him what brand his uncle gave. He replied that he gave the half circle IV. Nickel then said that he knew where such horses could be found. Defendant then borrowed a saddle from Will Billings, and left with Nickel to hunt Nickel's horses. Witness gave defendant some money, telling him to bring her some coffee and sugar if he went by the store. After defendant's arrest, witness sent for and got the saddle borrowed from Billings, and found the coffee in one of the pockets.

Jack Coggins testified, for the defense, that he had several horses in Coleman county, branded half circle IV. He gave the defendant, his nephew, authority to handle, look after and use those horses.

The motion for new trial raised the questions discussed in the opinion.

*Woodward & Vining*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. It is alleged in the indictment that the defendant did fraudulently take from the possession of J. C. Benton one certain horse, the same being the corporeal personal property of the said J. C. Benton. Both the ownership and the possession of the horse are alleged to be in J. C. Benton. It is shown by the evidence that, on the day before the alleged theft, J. C. Benton, the owner of the horse, loaned the same to his brother D. H. Benton. On the morning of the day of the alleged theft, D. H. Benton turned the horse over to a man named Bull, who took said horse to a place which D. H. Benton designated, and there hoppled out the horse. It had been agreed between D. H. Benton, Bull and others to set a trap to catch defendant stealing horses, as they had been informed by one Nickel that defendant had proposed to him to go into the horse stealing business with him.

The plan agreed upon was to place J. C. Benton's horse where the defendant and Nickel, who, by an understanding had with D. H. Benton, Bull and others, was to keep with and act with the defendant, could and would be likely to find the same, and to keep a watch on said horse, so that when the defendant and said Nickel should take him, they could arrest the defendant in

the very act of the theft. This plan to entrap the defendant, it appears, was not known to J. C. Benton, the owner of the horse, nor did he know for what purpose his brother had borrowed said horse.

Defendant took the horse, as it was anticipated he would, while said horse was hoppled upon its accustomed range, but while it was in the immediate control and charge of said Bull, and while the bailment thereof to D. H. Benton still continued. It is insisted by counsel for defendant that there is a fatal variance between the allegation of possession and the proof, and we are of the opinion that the position is a sound one. It is clear, we think, that, at the time of the alleged theft, the horse was in the actual legal control, care and management of D. H. Benton under and by virtue of the bailment from J. C. Benton to him. D. H. Benton was legally responsible to J. C. Benton for the horse. He did not hold the horse as the servant or employe of J. C. Benton, the owner. It can not be said that the horse was in the mere temporary custody of D. H. Benton. It was in the mere temporary custody of Bull, because he was controlling and using said horse under the direction of, and subordinate to the control of, D. H. Benton, the bailee and special owner of said horse.

Under the facts of this case both the ownership and possession of the horse should have been alleged to be in D. H. Benton, and necessarily the *possession* should have been alleged to be in him. (Willson's Texas Crim. Laws, secs. 1258, 1272, 1373.) It can not be said that the horse was on its accustomed range and therefore in possession of the general owner, J. C. Benton. The horse was not loose upon the range, but was hoppled and under the immediate surveilance of Bull. But if the horse had not been hoppled, being under the care, control and management of D. H. Benton, the special owner, the constructive range possession would be that of the special and not the general owner. (Willson's Texas Crim. Laws, sec. 1273; Littleton v. The State, 20 Texas Ct. App., 168.)

With respect to the question as to the consent of the owner of the horse to the taking thereof, we do not think there was any such consent as would protect the defendant in the commission of the theft. The owner of the horse did not either directly or through another suggest the theft to the defendant, or induce the defendant to commit it. The facts of this case are unlike those of Speiden v. The State, 3 Texas Court of Appeals, 156, cited by

'counsel for defendant.    Johnson v. The State, 3 Texas Ct. App., 590, and Allison v. The State, 14 Texas Ct. App., 122, and Pigg v. The State, 43 Texas, 108, are cases more in point.

As to the *taking* of the horse, we think the evidence sufficiently establishes it.    Asportation of the horse was not essential to complete the theft.    An actual manual possession of the property is not necessary to constitute theft under our code. (Willson's Texas Crim. Laws, secs. 1266, 1267, 1293.)

Because of the variance between the allegation and proof of possession, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered November 12, 1887.