[No. 1916]

## THE STATE OF NEVADA, RESPONDENT, *v.* M. J. SMITH, APPELLANT.

1. CRIMINAL LAW—APPEAL—FINDINGS—CONCLUSIVENESS.
    A finding of a jury as to whether one was an accessory is conclusive.

2. CRIMINAL LAW—"ACCOMPLICE."
    One who feigned participation in a larceny of ore which he was employed to watch, in order to assist in the detection of the accused, was not an "accomplice," so as to make his testimony subject to the rules regarding accomplices' testimony.

3. LARCENY—TAKING—CONSENT OF OWNER.
    The watchman of an ore milling company was directed by a deputy sheriff, who was in the employ of the company, to apparently agree to permit accused to extract and conceal ore, inducing accused to believe that he would act as an accomplice, but not to actually assist him in taking the ore; and the watchman made an arrangement with the accused by which he was to give a signal when accused could safely take the ore, but refused to actually assist in taking and disposing of it. *Held*, that there was no consent by the company's agents to the taking of the ore, so as to prevent its taking from being larceny.

4. CRIMINAL LAW—EVIDENCE OF ACCOMPLICES.
   In a prosecution for larceny of ore, statements of an accomplice, relating in part to the taking of the ore and its division according to agreement, were admissible in evidence; some ore having been taken thereafter, and the statements being material.

5. CRIMINAL LAW—EVIDENCE—EVIDENCE OF CO-CONSPIRATORS.
   A statement of an accomplice who conspired with accused to steal ore that he had made thousands of dollars for accused was not admissible in evidence in a prosecution for larceny; it not appearing whether the transaction referred to was illegal, and it not relating to the conspiracy.

6. CRIMINAL LAW—TRIAL—OBJECTION TO EVIDENCE.
   The objectionable part of evidence must be specifically pointed out, a general objection to its admission being insufficient, unless it is all incompetent.

7. CRIMINAL LAW—TRIAL—OBJECTIONS TO EVIDENCE.
   An objection to evidence on a specified ground waives all other grounds of objection.

8. CRIMINAL LAW—EVIDENCE OF CO-CONSPIRATOR.
   In a prosecution for larceny by conspiring with others to steal ore, evidence of a statement of one of the conspirators, after arrest, that another of them was a big boob, or he never would have been caught, etc., was not admissible in evidence; the conspiracy then being at an end.

9. CRIMINAL LAW—APPEAL—HARMLESS ERROR—ADMISSION OF EVIDENCE.
   Error in admitting a statement of a co-conspirator, in a prosecution for larceny by conspiring with others, that another conspirator was foolish, or he would not have been caught, and that if he had done as the speaker wished he would not have gone there, was harmless to accused, because he was not mentioned in the statement.

10. CRIMINAL LAW—HARMLESS ERROR—ADMISSIONS OF EVIDENCE.
    Error in admitting evidence of a fact which was apparently conceded, and to which other witnesses testified, was harmless to accused.

11. CRIMINAL LAW—APPEAL—HARMLESS ERROR.
    By the express provisions of section 589 of the criminal practice act (Comp. Laws, 4554), no error in criminal proceedings shall render them invalid, unless it actually prejudices accused in a substantial right.

NORCROSS, J., dissenting.

APPEAL from the District Court of the Seventh Judicial District of the State of Nevada, Esmeralda County, *Peter J. Somers*, Judge.

M. J. Smith was convicted of grand larceny, and, from

the judgment of conviction and an order denying a motion for a new trial, he appeals.. **Affirmed.**

The facts sufficiently appear in the opinion.

*Thompson, Morehouse & Thompson,* and *R. L. Hubbard,* for Appellant:

I.   It will be seen that, to warrant a conviction, there must be proven beyond a reasonable doubt, and by admissible testimony:

· First—A conspiracy, between Smith, Miller, Knight and Hildebrandt, to rob the plates of the mill of amalgam;

Second—That defendant was in such conspiracy;

Third—That in pursuance of such conspiracy—not some other—the amalgam was stolen;

Fourth—That Smith received the amalgam.

II.   First—A conspiracy cannot be proven by the declarations, admissions, and acts of a co-conspirator. These declarations, admissions, and acts, are only admissible after the conspiracy has been proven, and then only such declarations, admissions, and acts as are in furtherance of, and in pursuance of the conspiracy. This is elementary law, but violated from the beginning to the end of this trial over the objections and exceptions of the defendant.

(a) Conspiracy cannot be proven by the acts and declarations of alleged co-conspirators.

"The conspiracy itself cannot be shown by proof of acts of the alleged conspirators taken separately." (McClain, Crim. L., sec. 989; *Shields* v. *McKee,* 11 Ill. App. 188; Jones on Evidence, sec. 255; *Metcalf* v. *Connor,* 12 Am. Dec. 340; *Burke* v. *Miller,* 7 Cush. 747; 1 Greenleaf on Evidence, sec. 111; *People v. Irwin,* 20 Pac. 56.)

This, as we shall show, is just this case.   A prearranged and manufactured case, made up through the testimony of Zimmerman, a self-confessed liar, and Miller, a self-confessed thief, backed by a villainous scheme.

In *Chapman* v. *Blakeman,* 3 Pac. 277, the court says: "The declarations of an alleged co-conspirator is incompetent to prove the conspiracy, and the statements of an alleged co-conspirator made out of court cannot be intro-

duced from another witness to support or fortify his testimony."

In 3 Ency. of Evidence, 411, we read: "The existence or nature of a conspiracy cannot be established by the acts or declarations of one conspirator in the absence and without the knowledge and concurrence of the others."

In 24 Fed. Cases (No. 14,487) it is said: "No man's connection with the conspiracy can be legally established, by what others did in his absence and without his knowledge and concurrence."

In *Osmun* v. *Winters*, 46 Pac. 780, the Supreme Court of Oregon says: "The admissions and statements of one of the alleged conspirators, while not in the presence of plaintiff, touching the supposed conspiracy, are inadmissible." To the same effect: *Wiggins* v. *Leonard*, 9 Iowa, 194; *Ford* v. *State*, 112 Ind. 373–383.

It will thus be seen that this rule is elementary.

(b) The next elementary rule is, that after the conspiracy has been proven, only those acts and declarations of the co-conspirator are admissible in evidence, which are in the furtherance of, and in aid of the common design. Acts and declarations merely narrative of what has been done, or will be done, are not admissible, except against the person who did the things or made the declarations.

In the great case of *Spies* v. *People*, 122 Ill. 1, the court says: "Declarations that are merely narrative as to what has been done, or will be done, are incompetent, and should not be admitted, except as against the defendant making them, or in whose presence they are made."

In 3 Ency. of Evidence, 429, it is said: "In order that evidence thereof be admissible, the acts and declarations of the supposed co-conspirators must be those only which were made during the pending of the wrongful enterprise and in furtherance of its object."

"Declarations of a conspirator are received against his fellows only when they are either in themselves acts, for which the others are responsible, but not when they are in the nature of narratives, descriptions, or subsequent

confessions." (State v. Ross, 29 Mo. 32, 50; State v. Weaver, 57 Iowa, 730; Patton v. State, 6 Ohio St. 467; Cohen v. State, 11 Tex. App. 153; People v. Arnold, 46 Mich. 268; Ruper v. State, 25 Ohio St. 464; Wiggins v. Leonard, 9 Iowa, 194.)

In People v. Stanley, 47 Cal. 113, the court says: "The rule is well settled that the acts of an accomplice are not evidence against the accused, unless they constitute a part of the res gestæ, and occur during the pendency of the criminal enterprise, and are in furtherance of its objects." (1 Greenl. on Ev., sec. 111; 3 Phillips on Ev. 396.)

So in People v. Moore, 45 Cal. 19, the court says: "It is not competent to use as evidence against one on trial for an alleged crime, the statements of an accomplice not given as testimony in the case, nor made in the presence of the defendant, nor during the pendency of the criminal enterprise and in furtherance of its objects."

(c) One accomplice cannot corroborate another accomplice. This is also elementary law, for, as is said in U. S. v. Hing, 35 Fed. 281: "If two or more accomplices are produced as witnesses, they are not deemed to corroborate each other, but the same rule is applied, and the same confirmation required as if there was but one." (People v. Smith, 33 Pac. 58; Blakely v. State, 5 Am. St. Rep. 912.)

This last case says: "One accomplice cannot corroborate himself, nor can the evidence of one accomplice corroborate that of another." (Roberts v. State, 44 Tex. 119; Carroll v. State, 3 Tex. App. 117; Heath v. State, 7 Tex. App. 464; Gonzales v. State, 9 Tex. App. 374; Phillips v. State, 17 Tex. App. 169; State v. Williamson, 42 Conn. 261; Porter v. Conn, 61 S. W. 16; Howard v. Conn, 61 S. W. 756; Whitlow v. State, 8 S. W. 865; McConnel v. State, 18 S. W. 645.)

Corroboration, to be of any effect, must connect him with the crime itself, and not simply with its perpetrators, for as is said in 1 Ency. of Evidence, p. 107: "It is

not sufficient for this purpose, merely to connect the defendant with the accomplice, or other person participating in the crime, but evidence, independent of the testimony of the accomplice, must tend to connect him with the crime itself, and not simply with its perpetrators." (*Smith* v. *Com.*, 17 S. W. 182; *State* v. *Odell*, 8 Or. 30; *Wright* v. *State*, 43 Tex. 170; *People* v. *Larsen*, 34 Pac. 514; *State* v. *Mikesell*, 70 Iowa, 176.)

"The law requires corroboration as to the circumstances of the crime." The rule of corroboration is that the evidence must be to the overt act—the commission of the offense. (*People* v. *Main*, 46 Pac. 612; *People* v. *Thompson*, 50 Cal. 480; *People* v. *Koening*, 99 Cal. 574; *People* v. *Smith*, 98 Cal. 218; *People* v. *Compton*, 56 Pac. 44; *People* v. *Hoagland*, 71 Pac. 359.) All these cases are from California, where the statute is the same as ours, and the ruling is the same in the following cases: *People* v. *Sciaroni*, 89 Pac. 133; *State* v. *Bond*, 86 Pac. 43; *State* v. *Kunston*, 83 Pac. 226; *Cooper* v. *Territory*, 91 Pac. 1032.

In *State* v. *Carr*, 42 Pac. 215, the Supreme Court of Oregon says: "Under all the authorities, one who, being of mature years, and in possession of his ordinary faculties, knowingly and voluntarily cooperates with or aids and assists another in the commission of a crime, is an accomplice, without regard to the degree of his guilt. (1 Russ. on Crimes, 49; Wharton's Cr. Ev., sec. 440; Bishop's Cr. Proc., sec. 1159; *Cross* v. *People*, 47 Ill. 153.)"

As is said in *Connor* v. *People*, 36 Am. St. Rep. 295, "to constitute larceny there must be a trespass, that is, a taking of the property without the consent of the owner, coupled with an intent to steal the property so taken; and the crime is not committed, when, with the consent of the owner, his property is taken, however guilty may be the taker's purpose and intent."

And it does not matter who inspired or thought of the enterprise, whether it commenced with the alleged thief or not, because the point is the consent, the consent destroys the trespass—the unlawful taking, for, as Mr.

Bishop says (5th ed. Cr. Law, sec. 262) "the consent will take away the criminal quality of the act; there is no legal crime committed."

Nor does it matter whether the owner, the mill company, knew of it or not, for the servant consenting is the same as the mill company, which was the case of *Regina* v. *Johnson*, 41 Eng. C. L. R. 123, where the servant consented, acting through the advice of the police, to open a door to accommodate the alleged burglars having proposed to rob the house. Here the proposition came from the burglars, and the consent was that of the servant. Held, no burglary.

To the same effect is *Allen* v. *State*, 40 Ala. 334; *Speiden* v. *State*, 3 Tex. App. 163; *Dodgers* v. *Brittain*, Meigs, 84; *Kemp* v. *State*, 11 Humph. 320; *State* v. *Chambers*, 6 Ala. 855; *Zink* v. *People*, 77 N. Y. 114; *Saunders* v. *People*, 38 Mich. 218.

In *State* v. *Hull*, 33 Or. 56, it is held, "to constitute larceny there must be a taking of property without the consent of the owner. Therefore, the crime is not constituted where the agent of the owner, acting under the latter's instructions, aids and abets the suspected thieves in taking the property, the object of the scheme being to entrap and discover the guilty parties."

This is our case exactly. The prosecution must stand upon the guilt or the innocence of Zimmerman. If he was guilty then he is an accomplice, and there is no testimony in this case. If he is innocent, then the property was taken by his full consent, and he was the agent acting for and under the instructions of his employer, and aiding and abetting, inducing, encouraging and, by preconcert, agreeing and participating in the alleged crime.

Section 1958, Criminal Code of California, says: "An inference is a deduction which the reason of the jury makes from the facts, without an express direction of law to that effect." The court has no authority to draw the inference for the jury. It is their duty.

In *Ayres* v. *State*, 21 Tex. App. 399: "The trial court should in no instance charge the conclusiveness of such

inference or presumption, but should submit them as facts to be found by the jury; for at most they are but circumstances from which guilt is inferred, and not positive proof establishing it." Here, the court submits the facts, etc., to the jury, and then tells them, if you find the facts so and so, then you may infer the requisite criminal intent. And what else; that the defendant entered into the arrangement wilfully and feloniously and intended, etc. Thus the very questions for the jury, to wit, criminal intent, wilfully, feloniously, is taken from the jury, and conclusively inferred by the court.

"It is not for the judge to say what amount or degree of evidence is sufficient. To do so is to charge upon the weight of evidence and is reversible error." (*Stockman v. State*, 24 Tex. App. 387; *Rice v. State*, 3 Tex. App. 451; *Lunsford v. State*, 9 Tex. App. 217.)

In *McKurn v. Neb. St. R. R.*, 59 Cal. 294, it is said: "The jury under such circumstances are to make such inference from the testimony as legitimately and justly follow, on which to base their verdict; they are not only to find the facts, but the inference from them."

All the decisions hold the same. There then can be no question but this instruction is erroneous.

*R. C. Stoddard*, Attorney-General, for the State.

By the Court, TALBOT, J.:

The appellant was convicted of the crime of grand larceny and sentenced to the state prison for the term of three years. From the judgment of conviction and from an order denying his motion for a new trial, he has appealed.

He was jointly indicted with three others, Bart Knight, J. Hildebrandt, and Martin Miller, for the stealing of gold amalgam of the value of $400, the property of the Goldfield Consolidated Milling and Transportation Company, on the 30th day of January, 1910, or thereabouts. The defendant, Martin Miller, was dismissed from the indictment and made a witness for the state, under the provi-

sions of section 361 of the criminal practice act (Comp. Laws, 4326).

The defendant, M. J. Smith, appellant herein, was granted a separate trial. While he was indicted as a principal, he was proceeded against under the provisions of Compiled Laws, section 4665, upon the theory that he was an accessory before the fact. The same situation existed, so far as the other two defendants, Knight and Hildebrandt, were concerned. It was the theory of the state that a conspiracy had been entered into between Smith, Knight, Hildebrandt, and Miller to steal gold amalgam from the mill of the Goldfield Consolidated Milling and Transportation Company; the actual theft to be committed by Martin Miller. On the evening of the 13th of February, 1910, Miller was arrested in the act of taking amalgam from the plates of the mill, by one Clarence A. Sage, a deputy sheriff of Esmeralda County and special officer for the Goldfield Consolidated Milling and Transportation Company. After the arrest of Miller, he was taken to the office of the attorneys of the company, where he made a confession of his participation in the act upon which the indictment was based.

The evidence of the conspiracy which the state sought to establish, and which it is contended upon the part of the state was established, was in substance as follows: The defendant Smith, who was an assayer in the town of Goldfield, approached Martin Miller, who was in the employ of the Goldfield Consolidated Milling and Transportation Company as an amalgamator, with the suggestion that he obtain gold amalgam from the mill. Miller informed Smith that he could not do this, because of the fact that he was under the surveillance of a watchman. Smith then informed Miller that he would arrange to have the watchman "fixed." Subsequently Smith informed Miller that he had "fixed" the watchman through the agency of defendant Jake Hildebrandt, and that Miller would know that it was safe for him to proceed to take the amalgam when the watchman, W. M.

Zimmerman, would say to him, "All right." The proof of the conspiracy to commit the crime charged in the indictment rested mainly upon the testimony of the defendant Miller and Zimmerman. The defendants Knight and Hildebrandt did not testify; but statements made by them were received in evidence, over the objection of counsel for the defendant, upon the theory that they were co-conspirators.

It has been strongly urged upon the part of the appellant that there was no corroboration of the testimony of the defendant Miller, and hence, under the statute (Comp. Laws, 4330), there was no sufficient proof of the crime charged as against the defendant Smith. It is contended upon the part of the state that there was sufficient corroboration of the testimony of Miller by reason of the testimony of the witness Zimmerman, who detailed a conversation had with the defendant Smith in which, according to the testimony of Zimmerman, Smith admitted his criminal relations with the defendant Miller. It has been seriously urged upon the part of counsel for the appellant that Zimmerman himself was an accomplice, and therefore his evidence could not be considered as corroborating that of Miller. We need not, we think, consider this contention at any length, for there was testimony upon the part of Zimmerman and other witnesses that Zimmerman was a feigned accomplice, and whatever participation he had in the affair was for the purpose of detecting the parties to the conspiracy. The question as to whether Zimmerman was or was not an accessory was submitted to the jury upon a proper instruction, and the finding of the jury as to that fact would in any event be conclusive.

In *State* v. *Douglas*, 26 Nev. 204, 99 Am. St. Rep. 688, the accused planned the larceny and suggested it to one King, who consented to join in the commission of the offense, but did not, and who kept the sheriff informed regarding the plans of the defendant, and was appointed his deputy. It was held that King was neither a

co-conspirator nor an accomplice, and that his evidence should not be treated as such. The conviction was sustained. (*Campbell* v. *Commonwealth*, 84 Pa. 187.)

The most serious question presented by the record in this case is in reference to the contention made by counsel for the appellant that the facts fail to establish a case of larceny, because it is shown conclusively that the amalgam was taken by the defendant Miller with the consent of the Goldfield Consolidated Milling and Transportation Company, through its authorized agents. In order to determine this question, it will be necessary to review portions of the testimony of the witnesses Miller, Zimmerman, and Sage. Miller, the real accomplice, and Zimmerman, the feigned accomplice, do not entirely agree in their important testimony. The jury were at liberty to believe Zimmerman. They both state that Zimmerman said to Miller, "It's all right." Anything that Miller understood from this was in connection with the plan of his confederates, Smith and Hildebrandt. Miller testified that Zimmerman told him to go ahead. The latter denied this, and testified regarding Miller: "Well, after I told him, 'All right,' he said, 'Did you see Jake?' I says, 'Yes.' He says, 'Well, how will we do it?' I said, 'I supposed you had it all arranged.' I was not supposed to have anything to do with it. He says, 'Well, I'll take some off and give it to you, and you can cache it for me, and I will get it as I go home.' I says, 'No; I won't do that. In the first place, I don't believe it's safe for me to handle it. It's up to you.' He says, 'How will we do it?' I says, 'That's up to you.' I supposed from what Hildebrandt said that everything was arranged."

Regarding the conversation at the California Beer Hall the next day, Zimmerman testified: "Miller insisted on taking the amalgam and giving it to me, but I refused; told him I wouldn't do it. I told him, in the first place, that Mr. Hildebrandt had told me that I would not have anything to do, only turn my back on the proceedings, and that, in the second place, I didn't think it was safe;

that the watchmen were possibly watched as much as the watchmen watched the workmen, and I wouldn't do it. After we had argued the matter some few minutes, he said he would go ahead, all right, and take it himself. * * * Q. Did you give him any permission to remove that amalgam? A. No more than just as I have stated; that I just said, 'All right,' and didn't object to him doing it. Q. Did you give him any express permission; did you say, 'You may take this amalgam from this mill?' or anything of that kind? A. No, there was no such conversation as that. * * *"

Zimmerman further testified: "I didn't open the way. I didn't make the proposition. They made the suggestion to me, and after I was advised I done what I did. Q. Didn't you make a suggestion? A. No; Miller made the suggestion to me. Q. I thought you said to Miller, 'All right?' A. I did. Q. Up to that time Miller hadn't said a word, had he? A. He had not. Q. Wasn't that suggesting to Miller that he go ahead and do this? A. Hildebrandt told me to say to Miller, 'All right,' so he could know from me personally that it was all right to go ahead. Q. You were acting upon instructions from Hildebrandt? A. I was."

Sage, the detective of the company, testified regarding Zimmerman: "Told him not to touch any of the amalgam himself in any way. Told him not to give his consent to stealing, and to stand there and watch him, but not give his consent."

Although both are near the border line, the Wisconsin decision, to which our attention has been called, may be distinguished from the present one. That case and others, such as State v. Hull, 33 Or. 57, 54 Pac. 159, 72 Am. St. Rep. 694, and State v. Waghalter, 177 Mo. 676, 76 S. W. 1028, holding that a conviction cannot be sustained if the owner of the property, for the purpose of entrapping the thief, advises and assists in planning and carrying out the taking, are distinguished from cases more similar to the present one in 30 L. R. A. (N. S.) 951, where it is said regarding that case: "The trespass necessary to consti-

tute larceny is absent, also, where a property owner, upon
being informed of a design to steal his property, places it
upon a platform where the intending thief is planning to
get it, with instructions to his servant in charge of the
platform to deliver it to the one who will call for it, so
that when the intending thief arrives, he is treated as
having a right to the property, especially where another
agent of the owner, sent to arrange for the taking of the
property, has agreed to the place proposed by the thief,
under circumstances which involve a promise of assistance
in carrying out the plan. (*Topolewski* v. *State,* 130 Wis.
244, 109 N. W. 1037, 7 L. R. A. (N. S.) 756, 118 Am. St. Rep.
1019, 10 Am. & Eng. Ann. Cas. 627.)"

There the agents of the company owning the property
assisted in planning for the taking and aided in the
removal of the property; here, according to the testi-
mony, the defendant designed the larceny, approached
and induced his codefendant Miller to take the amalgam
from the plates, and also planned to have the watchman,
Zimmerman, approached and induced to allow the removal
of the property. The design was by the defendant, and
under his direction the amalgam was taken by his accom-
plice, Miller. Zimmerman, the watchman for the com-
pany, refused to advise regarding the method of taking,
or to take or handle, the amalgam. He followed the
instructions and plan of the defendant when he said to
Miller, "It's all right," although at the instigation of the
defendant and with the knowledge of the company he
allowed it to be taken. It does not appear that he was
authorized to assist, or assisted, in any way in the removal
of the amalgam from the plates, or from the possession
of the company. Having failed in his efforts to obtain
advice and assistance from Zimmerman, Miller in its
removal was acting as the agent of the defendant, and
not under instructions from the company. The better
reasoned cases hold that, where the accused designs the
offense and does all the acts necessary for its commission
without the actual aid of the owner of the property, he

is liable to punishment, although the owner may not prevent or may apparently acquiesce in its taking.

This question is treated extensively, and many cases are reviewed in a note at page 950 and adjoining pages of 30 L. R. A. (N. S.). It is there said:

"Likewise it has been held no defense to a prosecution for abstracting and embezzling money from the mails that it was taken from a decoy letter addressed to a fictitious person, and mailed by an inspector, for the purpose of detecting defendant if he should commit the crime."

"So, in *Goode* v. *United States*, 159 U. S. 663, 16 Sup. Ct. 136, 40 L. Ed. 297, the court said: 'That the fact that the letter was a decoy is no defense is too well settled by the modern authorities to be now opened to contention.' And in *Montgomery* v. *United States*, 162 U. S. 410, 16 Sup. Ct. 797, 40 L. Ed. 1020, on the authority of *Goode* v. *United States, supra*, it was held no defense to a prosecution for embezzling and stealing letters containing money which had come into defendant's hands as a railway postal clerk that such letters were decoys, and had been mailed for the purpose of detecting him."

"Consent of officers is no defense to a prosecution for burglary. Thus, in *People* v. *Laird*, 102 Mich. 135, 60 N. W. 457, the court said: 'The duty of the police lies beyond the protection of the public from a particular offense. It will not do to lay down the rule that, if a burglary is suspected, it is the duty of the police officers to prevent the commission of that particular offense, rather than lie in wait and secure the guilty parties. In such case the police do not encourage the commission of the crime, but simply apprehend parties bent upon the crime, who, in carrying out plans already formulated, rush into the arms of the officers. Even an informant accompanying his associates does not necessarily encourage their purpose, and it is not proper that he should, but he simply acquiesces in a plan already formed.'

"In *State* v. *Currie*, 13 N. D. 655, 102 N. W. 875, 69 L. R. A. 405, 112 Am. St. Rep. 687, it was held no defense to a prosecution for burglary that one present with and assisting defendant in the burglary was a detective, if the detective did not instigate the crime, and it was committed, as to every ingredient of it, by the defendant; nor that the owner of the building, to whom the detective disclosed that it was probably about to be burglarized by the defendant with the feigned assistance of himself, acting for the purpose of securing evidence of the intended burglary and other crimes, did not take steps to prevent the crime, but passively allowed it to go on.

"And it is no defense to the prosecution of one who was the instigator and prime mover of an attempt to commit burglary, with intent to steal, that one to whom the defendant proposed the crime, and who acted as a confederate, informed the owner of the premises to be burglarized of the intended burglary, and the latter, for the purpose of catching defendant, told the informer not to insist on defendant's coming, or to encourage him to come, but just to let him come along of his own free will and accord, and voluntarily, if he would; such conduct of the owner not amounting to a consent for defendant to enter the house or take property therefrom. (*Robinson* v. *State*, 34 Tex. Cr. R. 71, 29 S. W. 40, 53 Am. St. Rep. 701.)"

"So, it is no defense to a prosecution for taking property by force or threats, and against the owner's consent, in pursuance of a conspiracy for the purpose, that the prosecutor, after defendants had formed their guilty intent, laid a trap, and went voluntarily to their meeting place with money which was marked and furnished him by the prosecuting attorney for the purpose of entrapping defendants, who were thus entrapped into the hands of officers on the watch. (*State* v. *Piscioneri* (W. Va.) 69 S. E. 375.)"

"It was held no defense to a prosecution for an attempt to commit the crime of extortion that one from whom defendant sought to obtain money by threats of accusation of crime, and who paid the money to defendant, was

at the time acting as a decoy of the police, and trying to induce defendant to receive money from him under such circumstances as would render defendant guilty of a crime, and enable the police to arrest and convict him of it. (*People* v. *Gardner*, 144 N. Y. 119, 38 N. E. 1003, 28 L. R. A. 699, 43 Am. St. Rep. 741, 9 Am. Crim. Rep. 82.)"

"On a prosecution for criminal libel, it was held no defense that the person libeled, having been informed and believing that the defendant designed to publish a libel, employed a detective to watch him and take every step to detect him if he committed the offense, and even to cooperate with him for that purpose, and allowed the crime to be committed, for the purpose of detecting and prosecuting the defendant, but the latter was not solicited to commit the crime, nor was it even suggested to him. (*People* v. *Ritchie*, 12 Utah, 180, 42 Pac. 209.)"

"It was held no defense to a prosecution under the pure food act, for an interstate shipment of misbranded bottled water, that the shipment on which the indictment was based was secretly induced by a government detective in order to create a basis for a criminal charge. (*United States* v. *Morgan* (C. C.) 181 Fed. 587.)"

"And on a prosecution for selling goods bearing counterfeit labels, it is no defense that the purchaser, acting with a special agent of the owners of the labels counterfeited, knew that the labels on the goods purchased were counterfeits, and made the purchase for the purpose of proving the fact of sale by the defendant and having him prosecuted. (*People* v. *Hilfman*, 61 App. Div. 541, 70 N. Y. Supp. 621.)"

Henry P. Dalton, long the assessor of Alameda County, Cal., has been convicted recently of bribery, after having been entrapped by the payment to him of marked currency.

"In larceny and other crimes, where a want of consent of the individual affected is an element of criminality, instigation or consent to the crime is a defense to prosecution, if it negatives one of the essential elements of the crime charged, though not otherwise. Thus, in *Lowe* v.

*State,* 44 Fla. 449, 32 South. 956, 103 Am. St. Rep. 171, the court said: 'The authorities are abundant and the law unquestioned, that a taking by the voluntary consent of the owner or his authorized servant or agent, even though with a felonious intent, does not constitute larceny. But where the criminal design originates with the accused, and the owner does not in person or by an agent or servant suggest the design, nor actively urge the accused on to the commission of the crime, the mere fact that such owner, suspecting that the accused intends to steal his property, in person or through a servant or agent, exposes the property or neglects to protect it, or furnishes facilities for the execution of the criminal design, under the expectation that the accused will take the property or avail himself of the facilities furnished, will not amount to a consent in law, even though the agent or servant of such owner, by his instructions, appears to cooperate in the execution of the crime.'

"And in *State* v. *Adams,* 115 N. C. 775, 20 S. E. 722, it is said that the court correctly told the jury that, 'if there was the guilty intent previously formed by the defendant to steal certain property, and he carried out such design previously formed, he is guilty, notwithstanding the owner of the property was advised of the intended larceny, appointed agents to watch him, and could have prevented the theft, but did not do so, and allowed him to commit the theft, with a view of having him subsequently punished,'

"So, in *Crowder* v. *State,* 50 Tex. Cr. R. 92, 96 S. W. 934, it was held no defense to a prosecution for the theft of mules that the owner had employed a detective in order to catch defendant, who, he believed, had been stealing his stock, and that the detective, by direction of the owner, apparently encouraged defendant's design and led him on, provided neither the owner nor the detective induced the original intent on the part of the thief, though, if the intent and purpose to steal originated with, and was suggested by, the detective, it would be

a taking with the consent of the owner, and the defendant would not be guilty."

In the note at the end of the Topolewski case (10 Am. & Eng. Ann. Cas. 631) it is said: "It is no doubt true, as a general proposition, that larceny is not committed when property is taken with the consent of its owner, but it is difficult in some instances to determine whether certain acts constitute, in law, such consent. (*People* v. *Hanselman*, 76 Cal. 460, 18 Pac. 425, 9 Am. St. Rep. 238.) Under the authorities, the rule seems to be well established that, where the criminal design originates with the accused, and the owner does not in person or by an agent or servant suggest the design, or actively urge the accused on to the commission of the crime, the fact that such owner, suspecting that the accused intends to steal his property, in person or through a servant or agent exposes the property, or neglects to protect it, or furnishes facilities for the execution of the criminal design under the expectation that the accused will take the property or avail himself of the facilities furnished, and will in consequence thereof be captured or detected, does not amount to a consent in law, and the taking under such circumstances, amounts to larceny. (*Reg.* v. *Lawrence*, 4 Cox C. C. 438; *Rex* v. *Eggington*, 2 B. & P. 508, 2 Leach C. C. 913, 2 East, P. C. 494, 666; *People* v. *Hanselman*, 76 Cal. 460, 18 Pac. 425, 9 Am. St. Rep. 238; *Lowe* v. *State*, 44 Fla. 449, 32 South. 956, 103 Am. St. Rep. 171; *Varner* v. *State*, 72 Ga. 745; *State* v. *Duncan*, 8 Rob. (La.) 562; *State* v. *Adams*, 115 N. C. 775, 20 S. E. 722; *State* v. *Covington*, 2 Bailey (S. C.) 569; *Sanders* v. *State*, 2 Shan. Cas. (Tenn.) 606; *Alexander* v. *State*, 12 Tex. 540; *Pigg* v. *State*, 43 Tex. 108.) See, also, *Rex* v. *Ady*, 7 C. & P. 140, 32 E. C. L. 469; *Commonwealth* v. *Nott*, 135 Mass. 269; *State* v. *West*, 157 Mo. 309, 57 S. W. 1071; *State* v. *Jernagan*, 4 N. C. 483; *Dodge* v. *Brittain*, Meigs, 84; *Conner* v. *State*, 24 Tex. App. 245, 6 S. W. 138; *Robinson* v. *State*, 34 Tex. Cr. 71, 29 S. W. 40, 53 Am. St. Rep. 701. And this is so, though the agent or servant of such owner, by his instructions,

appears to cooperate in the execution of the crime. (*Lowe* v. *State*, 44 Fla. 449, 32 South. 956, 103 Am. St. Rep. 171.)"

Over the citation of authorities, it is stated in 25 Cyc. p. 44: "The fact that an agent of the owner acts as a supposed confederate of the thief is no defense to the latter, provided the original design was formed independently of such agent. So, where a detective employed by the owner acts with the thief, the taking is none the less larceny. And so, where a person approached by the thief as his confederate notifies the owner or the public authorities, and, being authorized by them to do so, assists the thief in carrying out the plan, the larceny is nevertheless committed."

In Bishop's New Criminal Law, vol. 1, sec. 262, the author says: "If a man suspects that an offense is to be committed, and instead of taking precautions against it sets a watch and detects and arrests the offenders, he does not thereby consent to their conduct, or furnish them any excuse. And it is not ordinarily otherwise, though the watching is accompanied by artifice. Thus, in larceny, exposing property or neglecting to protect it, under the expectation that a thief will take it, or furnishing any other facilities or temptations to such or any other wrongdoer, is not a consent in law. Burglary furnishes a frequent illustration, in cases where those intending to break into a house and steal tempt the occupant's servant to assist them, and, after communicating the facts to the master, he is authorized to join them in appearance. For what the burglars personally do under such an arrangement, they are by all opinions responsible; but the English doctrine seems to be that if the servant opens the door while they enter they are not guilty of breaking. In principle, probably they are not so if the servant is to be deemed the master's agent, not theirs, in opening the door. But as they had requested him to join them, and the master's consent was merely for their detection, the better view would appear to be to consider him their agent in the breaking, and hold them responsible for it. See *Alexander* v. *State*, 12 Tex.

540; *Rolland* v. *Commonwealth*, 82 Pac. 306, 22 Am. Rep. 758."

Some of the cases seem to make a distinction between the assistance rendered by an officer of the law and that rendered by the owner of the property, to aid the accused in the execution of his design to steal. Here, if it be claimed that Sage, who was a deputy sheriff, was acting for the company, instead of as an officer of the law, still the circumstances warrant the conviction of the defendant. Although employed by the company to protect its property, it is not shown that he and Zimmerman were authorized by the company to persuade and induce Miller or the defendant to take the property, or to aid in its removal. And for the purpose of detecting crime and entrapping the perpetrators they allowed the amalgam to be taken, but did not plan, urge, or advise its taking, or handle it, or assist in its removal.

Under the testimony, indicating that the offense was planned by the defendant, and that every act necessary to constitute grand larceny was done by his confederates, without the taking of the amalgam being suggested or advised by the company or its agents, more reason appears for holding the defendant guilty than in cases where accused persons have been inveigled into selling liquor unlawfully or committing other offenses, and especially so when they did not know that they were acting contrary to law. If any detective of the company had designed or planned its taking, or had induced the defendant to take it and had assisted in its removal, grounds would exist for his exculpation which do not appear in this case. If, instead of acting as a feigned accomplice, Zimmerman had acted as a real accomplice, and without notifying the company had done everything which he did according to his testimony, the design being by the defendant and the taking in pursuance of that design by his accomplice Miller, the conspiracy and acts resulting in the larceny of the amalgam, the thought, intent, and deed constituting the crime for which they may justly be held responsible would not have been less complete.

It is claimed that the court erred in allowing witnesses to testify regarding the statements made by Bart Knight at the house of Zimmerman, where Zimmerman had asked Knight to go and receive a share of the money obtained from the amalgam, and where two men had been secreted in a closet in advance, so as to overhear and note down the statements of Knight. According to the testimony, the declarations of Knight, made at that time, related in part to the taking of the amalgam and the division of the spoils, which had been agreed upon as a part of the conspiracy, which was not ended, for amalgam was taken once later. (*State* v. *Ward,* 19 Nev. 307, 10 Pac. 133.) These declarations, with the statements made to Knight by Zimmerman, tended to prove that Zimmerman acted as a feigned, instead of a real accomplice, so that his testimony would be allowed to support that of the real accomplice, Miller, and warrant the conviction of the defendant. (*Campbell* v. *Commonwealth,* 84 Pa. 187; *People* v. *Farrell,* 30 Cal. 316; *State* v. *Douglas,* 26 Nev. 196, 99 Am. St. Rep. 688.)

Some of the statements made by Knight at that time, regarding the defendant, in no way related to the conspiracy, and were not properly admissible. Among these was the one by Knight that he had made thousands and thousands of dollars for the defendant. The inference could be that this related to prior transactions, but whether legitimate or illegitimate does not appear. While admitting that testimony indicating the making of this or other statements not relating to matters connected with the conspiracy, and not tending to show that Zimmerman was acting as a feigned accomplice, was not proper evidence, no specific objection was made which required the trial court to segregate them from other declarations, which were admissible. A general objection to the admission of testimony, unless the whole of it is incompetent, is not sufficient. It is necessary to specifically point out the objectionable portion. (*Smiley* v. *Pearce,* 98 N. C. 185, 3 S. E. 631; *Holmes* v. *Lumber Company,* 150 Mass. 535, 23 N. E. 305, 6 L. R. A. 283; *State*

v. *Hope,* 100 Mo. 347, 13 S. W. 490, 8 L. R. A. 608, and note.)

An objection to evidence on a specific ground waives other grounds. (*Bailey* v. *Railroad Company,* 3 S. D. 531, 54 N. W. 596, 19 L. R. A. 653.)

Objection is also made to the testimony of Sage, regarding the statements made to him by Zimmerman concerning the taking of the amalgam, and conversations between Zimmerman and Miller. These also tended to prove that Zimmerman was not acting as a real accomplice.

It is further claimed that the court erred in the admission of the testimony of Allred, the deputy sheriff, who stated that Hildebrandt said upon his arrest that "Bart was a big boob, or he never would have been caught," and that if he had done as he wanted him to he never would have gone up there. The parties charged being under arrest, the conspiracy was at an end. This testimony was not properly admissible on the trial of this defendant, and ought to have been excluded; but the error in its admission appears to be harmless, because the witness did not mention the defendant, and the statements said to have been made by Hildebrandt were only against the interests of Hildebrandt and Knight.

The same principle would apply to the admission of the confessions of Miller that he had taken the amalgam, a fact testified to directly by witnesses on the trial, and a fact apparently conceded, and further proof of which would not injure the defendant. Errors which do not actually prejudice or injure the defendant do not justify a reversal. (*State* v. *Williams,* 28 Nev. 421.)

Following the recommendation of the American Bar Association, the late legislatures in some of the states have passed statutes somewhat similar to section 589 of our criminal practice act (Comp. Laws, 4554), which provides that no error or mistake in criminal proceedings shall render the same invalid, unless it had actually prejudiced the defendant, or tended to his prejudice in respect to a substantial right. This section has been in force here for half a century, having been passed by the

first territorial legislature, in 1861, and is amplified in sections 452 and 619 of our new criminal procedure, effective January 1, 1912.

We find no prejudicial error in the record, and the judgment of the district court is affirmed.

NORCROSS, J., dissenting:

I am unable to concur in the views of my learned associates in this case. In my judgment, the undisputed evidence in this case establishes such a consent upon the part of the Goldfield Milling and Transportation Company to the asportation of the amalgam by the defendant Miller as to remove from the taking the essential element of trespass going to make up the crime of larceny.

It appears from the testimony on the part of the State that the taking of the amalgam from the plates of the Goldfield Milling and Transportation Company had been going on at different times with the knowledge and acquiescence of the agents of the said company for a period of about a month prior to the arrest of the defendant Miller.

It has not been contended, upon the part of the state, that Zimmerman and Sage were not acting as the agents of the said milling and transportation company. They represented said company, in so far as their acts were concerned. It is also manifest from their testimony that both Zimmerman and Sage were deputy sheriffs, and that the removal of the amalgam from the plates could not have been accomplished without the cooperation of Zimmerman, unless Zimmerman himself be conceded to be an accessory before the fact. Miller testified that he never had any conversation with Hildebrandt prior to the time Zimmerman told him, "All right, go ahead." Miller further testified that he never would have attempted a theft of the amalgam, without having an understanding and agreement with Zimmerman.

It appears that when Zimmerman said to Miller, "All right," on the 16th of January, that Miller was not

entirely satisfied to go ahead upon that occasion, but requested a conference with Zimmerman the following day. This conference was had in pursuance of Sage's instructions to Zimmerman, and all subsequent acts upon the part of Miller in taking amalgam from the plates were in pursuance of the understanding which he had with Zimmerman upon the afternoon of the 17th of January. It is manifest from the testimony that it was practically impossible for Miller to remove the amalgam without the cooperation of the watchman Zimmerman, and Zimmerman so testified. The amalgam was removed from the plates in the presence of Zimmerman and with his consent, and Zimmerman's actions were in accordance with the directions of Sage, the chief detective of the company, and with the approval of the attorney of the corporation. Zimmerman not only entered into an agreement with Miller as to the manner in which the amalgam was to be taken, but further agreed that he was to give certain signs to Miller, if necessary, that would warn him against possible detection by other employees of the company. While it is true that Zimmerman did not participate in the original design to steal amalgam from the plates of the milling company, he did cooperate with Miller in perfecting the plan by which all of the amalgam was subsequently taken by the defendant Miller.

Something is attempted to be made of the point that there was some disagreement in the testimony of the state's witnesses, Miller and Zimmerman, and that the latter testified that the former was in error in saying that he said, "All right, go ahead"; that he only said, "All right." This, to my mind, is a distinction without a difference, when it was the understanding that the words "all right" were to be the signal for Miller to go ahead. Zimmerman himself testifies that on the night following the second taking of amalgam, when Miller gave him $14 as his part, that Miller said: "It wasn't hardly worth taking that small amount off. He said we might as well take more, to which I just assented." Upon another occasion (the last), prior to Miller's arrest,

Zimmerman testified relative to a conversation with Miller as follows: "After he had looked at the plates and got ready to go to work, he says, 'Well, we might as well go a little stronger and wind this thing up.' I says, 'Sure.'"

True, Sage testifies that he instructed Zimmerman not to consent, but there can be no question but that Zimmerman was instructed to assume the attitude of consenting. Zimmerman testified that he reported everything to Sage, and that he was acting under Sage's instructions.

There is no conflict in the authorities upon the proposition of law that, where the taking is with the consent of the owner, there is no larceny; but the difficulty is in applying the law to the facts of the given case. It is conceded in the prevailing opinion that this is a border-line case, and the only difference between my associates and myself is as to which side of the line it falls. In cases of this kind, it is necessary to keep clearly in mind that it is the question of consent or nonconsent, and not the *mala fides* of the defendant, which makes the taking a larceny or not.

The following excerpt from the case of *Williams* v. *State*, 55 Ga. 391, has been frequently cited with approval in cases of this character: "It seems to be settled law that traps may be set to catch the guilty, and the business of trapping has, with the sanction of courts, been carried pretty far. Opportunity to commit crime may, by design, be rendered the most complete, and if the accused embrace it he will still be criminal. Property may be left exposed for the express purpose that a suspected thief may commit himself by stealing it. The owner is not bound to take any measures for security. He may repose upon the law alone, and the law will not inquire into his motive for trusting it. But can the owner directly, through his agent, solicit the suspected party to come forward and commit the criminal act, and then complain of it as a crime, especially where the agent to whom he has intrusted the conduct of the transaction, puts his own hand into the *corpus delicti*, and assists the

accused to perform one or more of the acts necessary to constitute the offense? Should not the owner and his agent, after making everything ready and easy, wait passively and let the would-be criminal perpetrate the offense for himself in each and every essential part of it? It would seem to us that this is the safer law, as well as the sounder morality, and we think it accords with the authorities. * * * It is difficult to see how a man may solicit another to commit a crime upon his property, and when the act to which he was invited has been done be heard to say that he did not consent to it. In the present case, but for the owner's incitement, through his agent, the accused may have repented of the contemplated wickedness before it had developed into act. It may have stopped at sin, without putting on the body of crime. To stimulate unlawful intentions, with the motive of bringing them to punishable maturity, is a dangerous practice. Much better is it to wait and see if they will not expire. Humanity is weak; even strong men are sometimes unprepared to cope with temptation and resist encouragement to evil."

In the case of *Love* v. *People*, 160 Ill. 501, 43 N. E. 710, 32 L. R. A. 139, the court said: "A contemplated crime may never be developed into a consummated act. To stimulate unlawful intentions for the purpose and with the motive of bringing them to maturity, so the consequent crime may be punished, is a dangerous practice. It is safer law and sounder morals to hold, where one arranges to have a crime committed against his property or himself, and knows that an attempt is to be made to encourage others to commit the act by one acting in concert with such owner, that no crime is thus committed. The owner and his agent may wait passively for the would-be criminal to perpetrate the offense, and each and every part of it, for himself, but they must not aid, encourage, or solicit him that they may seek to punish."

Where the plan originates with the accused, and the

owner, upon learning of the same, actively urges or encourages the defendant on to its commission, the owner will be deemed to have consented.

In the recent case of *Topolewski* v. *State,* 130 Wis. 244, 109 N. W. 1037, 7 L. R. A. (N. S.) 756, 118 Am. St. Rep. 1019, 10 Am. & Eng. Ann. Cas. 627, which upon the facts is similar in many respects to the case at bar, the court said: "The logical basis for the doctrine above discussed is that there can be no larceny without a trespass. So if one procures his property to be taken by another intending to commit larceny, or delivers his property to such other, the latter purposing to commit such crime, the element of trespass is wanting, and the crime not fully consummated, however plain may be the guilty purpose of the one possessing himself of such property. That does not militate against a person's being free to set a trap to catch one whom he suspects of an intention to commit the crime of larceny, but the setting of such trap must not go further than to afford the would-be thief the amplest opportunity to carry out his purpose, formed without such inducement on the part of the owner of the property as to put him in the position of having consented to the taking. If I induce one to come and take my property, and then place it before him to be taken, and he takes it with criminal intent, or if, knowing that one intends to take my property, I deliver it to him, and he takes it with such intent, the essential element of trespass involving nonconsent requisite to a completed offense of larceny does not characterize the transaction, regardless of the fact that the moral turpitude involved is no less than it would be if such essential were present."

When Zimmerman, under instructions from Sage, said to Miller, "All right," or "All right, go ahead," whichever was the language used, and Miller declined to proceed without a more thorough understanding with Zimmerman, which understanding was had by directions from Sage to Zimmerman, and thereafter the amalgam was taken in pursuance of that understanding and in the immediate presence of Zimmerman, and with his knowl-

edge and apparent approval, under instructions from his superiors, I think a case is presented which amounts to consent on the part of the milling company.

The fact that there is evidence in this case that would support a conclusion by the jury that the several defendants had originated the plan to commit a larceny, and had conspired to that end, is not alone sufficient to constitute the asportation of the amalgam, in pursuance of that conspiracy, a larceny.

The several rules deducible from the authorities are, in my judgment, substantially as follows:

Where the owner, suspecting criminal intentions upon the part of the defendant, originates a plan to entrap him and actively aids in carrying it out, the courts universally hold no larceny is committed.

Upon the contrary, where the scheme originates with the accused, a larceny is held to have been committed, where the owner goes no farther than to facilitate the previously designed plan, and passively permits its being carried out by the accused in every material part.

But, although the scheme originates with the accused, if the owner, upon becoming aware of the same, actively encourages or aids the accused to carry out the plan, in order that he may seek to punish, no larceny is committed, for the reason that such aid or active encouragement is deemed to amount to consent. Especially is this so where the scheme is not feasible without the cooperation of the owner's agent, and the owner, as in this case, directs the agent to so cooperate.

Some very serious questions are presented upon the record as to the admissibility of evidence; but, if my view of the case is correct upon the main point, it would be unnecessary to consider them, and for that reason I express no opinion upon them.

I think the judgment should be reversed.