PEOPLE, PLAINTIFF AND APPELLEE, *v.* FAJARDO, DEFENDANT AND
APPELLANT.

APPEALS from the District Court of Mayagüez in Prosecu-
tions for Violation of the Internal Revenue Law.

Nos. 833, 850, 852.—Decided May 29, 1916.

INFORMATION—MOTION TO QUASH—SPEEDY TRIAL—NONSUIT—RECONSIDERATION—
AFFIDAVIT OF MERITS—APPEAL.—When a motion to quash an information on
the ground that it was not filed within the time prescribed by subdivision
1 of section 448 of the Code of Criminal Procedure has been overruled and
the defendant, in moving for a nonsuit after the prosecution had rested,
fails to ask for a reconsideration of the ruling on his former motion or
to call the attention of the court to the real question involved by reason
of the discrepancy between the facts as represented in the affidavits of the
*fiscal* and the facts as disclosed by the evidence introduced at the trial, he
cannot raise the said question for the first time on appeal.

LAW OF CASE—QUESTION OF LAW—APPEAL.—When a question of law has been
decided by the appellate court in the original appeal, it is the duty of
the trial court to apply the law in the manner indicated to the facts estab-
lished by the evidence introduced at the trial, omitting, but not necessa-
rily renouncing, any private opinion it may have as to the soundness of
the doctrine laid down.

INTERNAL REVENUE LAW—TRAP, INSTIGATION, INDUCEMENT OR INVITATION—CON-
NIVANCE.—There is no trap, instigation, inducement, or invitation on the
part of the Government or any of its agents when, as in this case, an inter-
nal-revenue agent, in accordance with instructions from his superior offi-
cers, pretends to acquiesce in a scheme which a person on his own initiative
suggested and repeatedly proposed to him to release alcohol from a dis-
tillery in violation of the law with the connivance of the said agent.

ID.—ID.—EVIDENCE.—The furnishing of a desired, solicited or necessary oppor-
tunity and the facilitating of the commission of an offense designed and,
in fact, consummated by the defendant, have been held by the courts to
be a fair and reasonable means of securing evidence for his prosecution
and conviction.

ID.—EXTRACTION OF ALCOHOL—EXCISE TAX.—The offense penalized by sections
3 and 6 of the Act of March 9, 1905, amending Chapter II, Title IX, of
the Political Code, as amended March 9, 1911, and March 13, 1913, does
not consist in the unlawful removal of padlocks from the warehouse and
tanks of the distillery, but in the failure to pay the taxes upon distilled
spirits prior to their removal from the factory.

The facts are stated in the opinion.

*Mr. Willis Sweet* for the appellant.

*Messrs. Howard L. Kern,* Attorney General, *R. W. Per-
kins, Jr.,* Assistant Attorney General, and *Jaime Sifre, Jr.,
fiscal* at large, for the appellee.

Mr. Justice Hutchison delivered the opinion of the court.

Defendant, appellant, was convicted in three cases of violating the Internal Revenue Law. The informations, except as to the different dates upon which the respective offenses are charged to have been committed and other minor details, the principal questions of law and the general tenor and effect of the evidence, are practically the same in all three cases. Appellant asked and obtained leave to file a single brief covering the entire ground and appellee, has followed the same plan with an additional statement and argument as to certain facts appearing in one case which do not appear in the other. Appellant also filed two reply briefs. The three appeals may be disposed of in a single opinion.

The history of these cases as viewed by appellant is outlined by him as follows:

"On the 24th day of September, 1914, the appellant was brought to trial on an information charging him with having released alcohol without having paid the internal revenue due to The People of Porto Rico.

"Originally there were four informations filed against the defendant, precisely alike in language, and charging the same offense, except that different dates were given as designating the time and number of the offenses.

"The first trial, had as aforesaid, resulted in an acquittal of the defendant. In this case, all of the evidence was introduced in behalf of the State, and upon the announcement by the State's Attorney that the State rested its case, counsel for defendant moved a nonsuit.

"The motion for a nonsuit was discussed at length by counsel of both sides, the court took the matter under advisement and on the following day, rendered its opinion and judgment, and by the terms of the latter acquitted the defendant and discharged his sureties.

"Reference is made to this case and the result of the trial because the defendant relies upon the proceedings and judgment in the same in support of the contention that in each of the subsequent convictions had, three in number, the court entered judgment depriving the defendant of his liberty without due process of law, all of which was in violation of the laws of the United States and of Porto Rico.

"(Copies of such proceedings in the said first trial of said cause as are deemed applicable to the case at bar are added to this brief

as an appendix under proper designations. The object is to show that the facts were the same in both cases.)

"From the judgment in this cause the state appealed to this court.

"In the meantime, the plaintiff had moved an amendment to the second information upon which the defendant was subsequently tried. To this information was added and made a part thereof the voluminous rules and regulations of the Treasury Department for the government of revenue agents, and other details regulating the collection of the internal revenues of the country.

"The defendant, by his counsel, moved the elimination of certain portions of the amended information offered, but the court overruled the motion and dismissed the information of its own motion, and ordered the same archived. The order of dismissal was based upon the opinion rendered in the cause numbered 733, in which action the defendant was acquitted. (Counsel respectfully crave permission to refer to said opinion, the same being in the files of this court Nos. 732 and 733.)

"The state then appealed from the order dismissing the action numbered 833, a cause now pending before this court on the appeal of the defendant under its present No. 850.

"We had, then, pending in this court, the appeal by the state in No. 733, the cause which was tried and in which the defendant was acquitted. On that appeal the state brought to this court only the pleadings and the opinion and judgment of acquittal.

"There was pending in this court at the same time the appeal of the state in number 833, the action which was dismissed by the district court of its own motion without trial, the dismissal having been based upon the opinion, and of course the record, in the cause numbered 733.

"Thereupon the defendant, by his counsel, moved the consolidation of the two appeals, the filing of one brief, and an order of this court to the appellant, the state, to bring up the record, a statement of the case upon which the first cause was decided, and the second cause dismissed.

"Pending this motion, counsel for the state moved the dismissal of the first appeal, that is to say, the appeal in cause numbered 733, and the same was dismissed without notice to counsel for the defendant.

"It followed that when the motion asking for a consolidation and the production of the record in the lower court came on for hearing,

no consolidation could be ordered, if for no other reason because there was but one appeal before the court.

"The motion to consolidate and bring up the record was dismissed at the hearing set for the same, but the question of jurisdiction was reserved for the final hearing in the cause now before the court on the second appeal, this time by defendant, and numbered 850, this court reserving the question of jurisdiction.

"At the final hearing, the contention of the defendant against the question of the jurisdiction of this court was denied and the case was sent back to the lower court for further proceedings not in conflict with the opinion of the Supreme Court.

"The cause was tried in the lower court after the return of the mandate from this court and the proceedings had, the witnesses presented, and evidence adduced, all was substantially the same as presented and adduced at the first trial had, and the result of which was the acquittal of the accused.

"Following exactly the proceedings had in the first case the defendant moved a nonsuit after the state rested, just as the motion had been made in the first trial on the informations mentioned.

"There can be no question or dispute but that the motion should have been granted by the district court and there is no doubt and can be no doubt that said motion would have been granted had it not been for the opinion of this court, which, according to the opinion of the lower court, had practically instructed the said district court to find the accused guilty.

"It is this most extraordinary phase of the case that, we submit, goes so far as to have deprived the defendant and the appellant at this bar of his liberty without due process of law. To the better understanding of the point we call attention to the said opinion of this court which is in the files of this court in case numbered 733.

"It will be remembered that at the hearing in this court, counsel for defendant insisted that the purpose of the appellant was to obtain an opinion from this court in advance of the other trials in the district court that should dominate the action of the lower court, rather than test the question of whether or not the complaint in itself stated a cause of action and that the judge erred in dismissing the same. It will also be remembered, because like the last statement, it is referred to in the opinion of this court, that counsel for the defendant admitted that the information did state a cause of action; and that unless this court should dismiss the appeal upon the ground that it had no jurisdiction, then it must send the case back to the district court for trial.

"It is not our purpose to deal with the intent of either this court

or of the district court. We deal only with the facts as they appear in the record and the result. The district court was dominated by the opinion of this court and reversed its former decision, just as we had feared it would do in the event the appellant obtained a decision upon what the lower court might interpret as the decision of this court upon the merits of this case.

"We have only to add that the appellant appeared in this court with a brief purporting to discuss the facts in the case that had not been tried, and the application of the law thereto, although no statement of the case, no record of any character or kind had ever been submitted to the accused or his counsel and not a word of evidence that had been adduced and presented at the trial had was brought here; and yet the lower court announced that its decision had been reversed, and that in effect it had been instructed to find the accused guilty, regardless of the facts in the case that had been tried, or was to be tried.

"And the lower court did so find, as stated in the opinions of that court and as set forth herein.

"The district court having denied the motion for a nonsuit, the defendant produced his evidence, which, regardless of what it was, was superfluous."

Aside from the reference to facts discussed in a brief for the Government on the former appeal, which were the facts stated in the amended information first above mentioned, and aside from the averment as to facts proven on the trial of the case wherein defendant was acquitted, as to which we are not advised beyond the contents of appellant's brief and of an opinion and order of the district court discussed and disposed of in our opinion on such former appeal,—if we first eliminate the bald assertion that the motion for nonsuit "should have been granted by the district court" and the rather persistent idea that the trial judge was "dominated" by the former opinion of this court, both of which assumptions beg the vital question at issue herein, and thereupon amend the theory as to a dismissal and archiving of the action by the district court prior to the said former appeal and as to the basis of the order then appealed from, to conform to the decision rendered on that appeal,—

the statement of the case as made by appellant is fairly correct.

Both the original and the amended informations in one of these cases, the attitude and argument of appellant upon the former appeal, the order of the trial court setting aside the amended information, the opinion of the trial judge rendered in the case previously heard and nonsuited, referred to in such order and made part thereof, the pertinent sections of the Excise Tax Law and of the Treasury Regulations, are all set forth in *People* v. *Fajardo,* 21 P. R. R. 429, to which we refer without unnecessary repetition for full information in this regard.

The assignment of errors herein is as follows:

"1. That the defendant is by the proceedings and judgment in said cause deprived of his liberty without due process of law.

"2. The court erred in overruling the motion to dismiss said information upon the ground that more than sixty days had expired after the arrest of the defendant and the filing of the indictment and arraignment of said defendant as provided by law.

"3. The court erred in overruling the motion to dismiss the information and discharge the defendant upon the ground that the charge embraced in the information accusing the defendant of releasing alcohol without paying the revenue is included in and is a part of the greater offense charged against the defendant, to wit: The charge of bribery upon which accusation the accused was already arrested and held for trial, the said bribery having been charged in connection with and as a part of the same transaction set forth in the said information then on trial.

"4. The court erred in overruling the motion of defendant requiring the plaintiff to elect to proceed upon the accusation charging a felony, or upon the misdemeanors, as both of said alleged offenses constituted a part of the same transaction and hence the same offense.

"5. The district court erred in overruling defendant's objection to the exercise of original jurisdiction in this case because in accordance with the Code of Criminal Procedure of Porto Rico original jurisdiction in misdemeanor cases is vested in the municipal courts.

"6. The court erred in holding that the Supreme Court had either

directly or indirectly instructed the trial court to find the defendant guilty.

"7. The court erred in overruling the motion for a nonsuit, after the plaintiff had rested his case.

"8. The court erred in overruling defendant's objection to the admission of the check issued by the witness Vázquez and marked as plaintiff's exhibit —.

"9. The evidence was insufficient to sustain the judgment.

"10. The court erred in entering judgment finding the defendant guilty.

"11. The court erred in sentencing the defendant under said judgment."

In our consideration of the questions thus raised we shall follow the order indicated in so far as may be convenient and consistent with a reasonable condensation of our own view of the case.

Under the first assignment it is intimated, without argument or citation of authority, that the second of the alleged errors resulted in depriving defendant of his liberty without due process of law. Upon the doctrine of *Pennoyer* v. *Neff* and *Scott* v. *McNeak* as to the necessity of a competent tribunal and jurisdiction over the person in order to constitute due process of law, is based the conclusion that "In every case that a man is not convicted by a court of proper jurisdiction, or is arraigned after the expiration of a period of sixty days after the arrest, without sufficient reason, and without taking any of these causes into consideration, is sentenced by a court, such a man has been deprived of liberty without due process of law." And, turning for a moment to the second assignment, a faint sidelight is found in the following: "We contend that the court lost jurisdiction to proceed because good cause was not shown. As to the general principle we cite the following authorities: *People* v. *Wrickham,* 113 Cal. 283; *People* v. *Buckley,* 116 Cal. 146; *People* v. *Bergerson,* 11 L. R. A. 573, and cases cited."

The reference last mentioned is clearly a miscitation. The other two cases speak for themselves and may be left

as submitted by appellant, without quotation or comment. Not only is this phase of the question of due process thus presented in a more or less attenuated form, but appellant, in order to state the proposition at all, concedes by necessary implication that if the court did not err, as alleged in the second assignment, then all question of jurisdiction, and, therefore, of due process of law, is eliminated. The point therefore requires no further consideration unless the proposition stated under the second assignment can be sustained.

The jurisdiction of both the trial court and this court is also questioned ''on the ground that the lower court having ordered the defendant acquitted, neither this court nor the lower court has further jurisdiction in the premises.'' The question having been adjudicated adversely to appellant herein, appellee in the former hearing, the point is not now reargued but merely saved ''because a trial without jurisdiction and conviction thereunder is taking from the accused his liberty without due process of law.''

The only proposition emphasized in argument as amounting to a want of due process of law is that ''the district court, by believing it had received from the Supreme Court instructions to find the defendant guilty, although no trial had been had, abandoned its responsibility in the premises, and in fact states that its judgment rests upon an order of the Supreme Court and not on the facts adduced at the trial.'' And here also we need only ascertain whether or not the premise is sound. This, of course, will depend upon whether or not the district court in fact held as alleged in the sixth assignment.

The whole argument under the second assignment is addressed to the merits of the showing made by the *fiscal* in opposition to the motion to dismiss. The reasons given by the *fiscal,* in his effort to justify the delay, are set forth in each case in three affidavits as follows:

"I, Angel Acosta Quintero, of age, married, resident of Mayagüez and *fiscal* of the Judicial District of Mayagüez, under oath declare and say:

"That on March 7, 1914, by virtue of the sworn testimony of Félix Vázquez, an internal-revenue agent of Porto Rico, from which testimony there appeared to be probable cause therefor, I caused the arrest of Mateo Fajardo Cardona, a resident of Mayagüez, as the author of three offenses against the executive power (felonies) and of four offenses of violation of the Internal-Revenue Law of Porto Rico (misdemeanors).

"That in the said month of March of 1914, in addition to the daily work of my office, I was engaged in criminal investigations of grave cases of murder and in attending to civil matters requiring the intervention of the *fiscal*, as well as in the arduous task of conducting the prosecution of criminal cases before the court and jury, for in the said month of March the court was occupied with the criminal docket and with the trial of such important and complicated cases as that against Alfredo Bravo for mayhem, that against Salvador Fulladosa y Souffront for embezzlement, and others, it having to continue the cases against Juan Rivera Vélez and Antonio Montalvo for murder on account of my illness which was caused by an excessive amount of work during that month.  These continuances were granted on the 28th of last March.

"In the first part of the month of April of 1914 I resumed my duties in the office and during that month devoted myself to obtaining sufficient evidence for formulating informations against Mateo Fajardo in the bribery cases and the cases of violation of the Internal-Revenue Law, in preparing the evidence in other criminal cases pending in the office, in investigating criminal acts occurring in the district and in investigating special matters submitted to me by the Attorney General, but on account of their many complications it was impossible to obtain during the said month sufficient evidence for the informations in the cases of violation of the Internal-Revenue Law against Mateo Fajardo, although I did secure good and sufficient evidence beyond all reasonable doubt in the cases of bribery against him.

"On the 4th day of the month of May, 1914, I filed three sworn informations in the office of the secretary of this district court against Mateo Fajardo Cardona for bribery (felonies) as the result of having obtained sufficient evidence therefor.  In the said month of May, in addition to the work of my office I had to conduct the prosecution of criminal cases being tried before the court and jury during a large part of that month.  In that month there were tried before the

jury such important cases as those for murder against Juan Rivera Vélez, Antonio Montalvo and Felipe Antonio Casiano. The work of the said month was particularly hard and excessive because it was the last term of the court of the fiscal year 1913–14 and the court was about to adjourn for vacation.

"In the months of June and July, 1914, the court was in vacation and I collected evidence in the misdemeanor cases of violation of the Internal-Revenue Law against Mateo Fajardo, consisting in removing and allowing to be removed alcohol from his distillery 'Eureka' in Hormigueros, and in order to do so I had to visit different towns of this judicial district, as well as the city of San Juan, on different occasions, for the importance of the case itself and the amount of the defraudations which affect and have affected in a large degree the estimated internal-revenue taxes to be collected by The People of Porto Rico required a careful, minute and special investigation, this offense being one of those which most excite public opinion because of its affecting the Treasury of Porto Rico and my investigations being connected with those being made by the Treasury Department of Porto Rico and *Fiscal* Jaime Sifre, Jr., with the same object— investigations which have required the employment of detectives, the searching of account books of corporations and companies, the examination of accounts in the books of the Treasury and offices of tax collectors, and securing affidavits of residents of different towns and cities of the island.

"In the month of last June I also had to go to the city of Guayama to attend the district court of that judicial district to conduct the prosecution of criminal trials before the same and the jury on account of the absence on leave of the *fiscal* of that district, Santiago Vivaldi Pacheco, and I remained in that city several days.

"The investigation work for securing sufficient evidence upon which to file informations in the misdemeanor cases of violation of the Internal-Revenue Law against Mateo Fajardo Cardona, for which he was arrested on the 7th day of March of this year, was terminated during the first part of this month and on the 11th day of the same I was able to and did sign, swear to and file four informations for violations of the Internal-Revenue Law of Porto Rico for which the said Mateo Fajardo Cardona had been arrested and gave bail.

"All these investigations were necessary and indispensable in order to be able to present the cases to the court with full details of good, direct and circumstantial evidence to sustain the charges against a defendant beyond all reasonable doubt.

"During all this lapse of time I have given constant attention to the said cases and to the investigations made under my orders in this judicial district as well as to those made in the island by *Fiscal* Sifre and the agents of the Treasury of Porto Rico.   This work has required time on account of its transcendent importance and in carrying it out there has been no negligence or delay nor could it have been done reasonably in less time.

"I, Zenón Ortiz, I. P., badge No. 36, of age, married and resident of Mayagüez, under oath declare and say:

"That about the month of March, 1914, the *fiscal* of the Judicial District of Mayagüez, Angel Acosta Quintero, gave me a special commission to investigate the removal of alcohol without paying the corresponding internal-revenue taxes, charged against Mateo Fajardo Cardona, of Mayagüez, for which offense he was arrested and gave bail.

"That my duties consisted in verifying and obtaining evidence of the removals in wagons of alcohol distilled in the 'Eureka' distillery belonging to said Mateo Fajardo Cardona and was in connection with the wagon drivers who hauled the same.   This work kept me fully occupied for days in Mayagüez, Hormigueros, Cabo Rojo, San Germán and other towns of the district, and the results of my investigations were made known to *Fiscal* Acosta Quintero.

"That this work was concluded by me about the last of the month of last July and I gave the final result of the same to *Fiscal* Acosta Quintero during the first days of the month of August.

"That there has been no delay in this work and I did it in a way to get the best results and not create suspicion on account of my being a policeman in Mayagüez and it could not have been done in less time, there being no negligence or dilatoriness.

"I, Jaime Sifre, Jr., of age and resident of San Juan, under oath declare and say:

"That since the month of March, 1914, by order of my superior, I have been making investigations, not only in the District of Mayagüez, but in all parts of the island, of certain violations of the Internal-Revenue Law, among other things, which The People of Porto Rico charge Mateo Fajardo Cardona with having committed by removing alcohol from his distillery without having paid the taxes imposed by law, the case being of great importance on account of the amount involved.

"That these investigations were difficult and laborious inasmuch as it was necessary to locate the alcohol said to have been unlawfully removed, and in order to do this it was necessary to make a detailed

examination of the books of various corporations and companies, and all this work was concluded in the first part of August, 1914.

"One of the objects of these investigations was to secure certain evidence to add to the evidence which the district *fiscal* had as probable cause for the arrest of Mateo Fajardo Cardona for violation of the Internal-Revenue Law. This evidence was indispensable for the purpose of filing in the court the corresponding information with detailed particulars. There was no delay and the work could not have been done in less time, considering its importance and magnitude and the fact that different towns and cities had to be visited."

The facts developed at the trial are remarkably few and simple. Indeed, all of the evidence for the prosecution as stated in narrative form in the record, including objections, rulings, exceptions, statements and admissions by counsel, and full cross-examination in at least one case, No. 833, is even less voluminous than the contents of the sworn statements just quoted. It appears that in December, 1913, or January, 1914, by reason of a suspicion that frauds were being committed, a revenue agent named Vázquez was sent to take charge of the Mayagüez district and to investigate the situation. Shortly after his arrival he was approached on several occasions by Fajardo who broached the question of avoiding payment of taxes on distilled spirits, described the method pursued by him in connivance with former agents and offered to do business upon the same basis with Vázquez, his proposition being to pay to the agent forty per cent of the amount due the Government on all alcohol removed without payment of the tax. Vázquez came to San Juan, reported and received instructions from the Attorney General and the Treasury Department to accept the proposition to allow Fajardo to draw whatever alcohol he desired on the terms suggested by him, to take the money and to secure any other evidence available. He returned to Mayagüez and thereafter as often as he was requested by Fajardo went to the distillery, removed the padlocks from the warehouse and from the storage tanks contained therein and permitted Fajardo or his agents and employees to remove upon each occasion a

quantity of alcohol upon which the tax was duly paid and
in addition thereto an amount previously specified by defend-
ant upon which no tax was paid.   Vázquez likewise, pursuant
to instructions received in San Juan, deposited in a local
bank the money paid to him by defendant in each instance,
drew checks in favor of the Treasurer of Porto Rico to cover
same and delivered them to the Treasurer.   These checks
were retained without endorsement or presentation for pay-
ment and were used as evidence on the trial.

In case No. 852 defendant, on February 14, removed some
five hundred and fifty liters without payment of the tax
thereon; in No. 850, on February 18, another five hundred
and fifty liters more or less were removed in the same man-
ner; and in No. 833, on February 21, the Government was
again defrauded of the taxes due on about four hundred
liters.

Appellant very naturally insists that, as disclosed by the
record, no evidence of the character said to have been ob-
tained during the period of delay was used; that the record
conclusively shows that every scintilla of evidence the pro-
secuting attorney ever had in the misdemeanor cases was in
his possession or subject to his power of immediate produc-
tion when the warrants of arrest were issued; that there
was a special *fiscal* in the field to aid in the preparation of
these cases, and that counsel for the State simply relied upon
an exercise of the discretion of the court that amounted to
indulgence and abuse of discretion.

Appellant overlooks the fact that the district court at
the time of its ruling had not heard a word of testimony in
any of these cases.   It did not know, and could not have known
then, what is now disclosed by the record as to how much
evidence was in the hands of the prosecution at the time of
the arrest and how much or how little, if any, additional evi-
dence was subsequently discovered before filing the informa-
tion.

In matters of this kind the court of necessity must rely

very largely, if not entirely, upon the representations of the district attorney, and should never feel constrained either to probe the conscience or question the veracity of that officer of the court. And it would seem to follow that the *fiscal,* who alone knows the facts, should never for a moment forget the seriousness of the moral responsibility thus placed upon him and should most scrupulously avoid the possibility of misleading the court to any extent whatsoever through failure, inadvertent or otherwise, to respect and deserve the confidence so reposed in him.

We do not mean to insinuate that the officers of the government in this case were guilty of any deliberate misconduct or of any actual intention to deceive the trial court. On the contrary, in the handling of these matters, they have shown from the beginning commendable zeal, untiring energy and consummate skill and ability in the face of much difficulty and many great obstacles, and we do not harbor even the remotest suspicion of any improper motive or of any conscious purpose to take undue advantage of a situation which demanded of them a much higher degree of candor and accuracy of statement than they seem to have realized. But we do think that the true character of these particular cases was very much distorted and exaggerated in the affidavits above quoted, and that, in so far as the contents and general tenor and effect of those sworn statements were calculated to mislead the court, such failure to be open and frank in such an emergency is to be condemned as establishing a precedent which, if tolerated, might soon develop into an extremely pernicious and improper practice.

It may be that if defendant had called the attention of the trial court to the discrepancy between the facts as represented in these affidavits and the facts as disclosed by the testimony upon the trial, and had asked for a reconsideration of his former motion at the time he moved for a nonsuit upon other ground, or perhaps if he had only renewed his motion for dismissal after the filing of the amended information

with its wealth of significant detail, then the action, in the absence of any further showing, would have been dismissed. For the purposes of this opinion it may also be conceded that, if the question had been so raised below and the trial court, in the absence of any further or better showing by the *fiscal,* had refused to dismiss, we would have been inclined to reverse its ruling so invoked. However this may be, it is not the purpose of this court by a tacit approval of the tactics employed by the prosecution herein, or otherwise, to encourage what seems to be a growing disregard of the right to speedy trial which is guaranteed to every defendant who. in good faith wants and demands it. But the accused must claim the right. He cannot waive his privilege when he should have insisted upon it and then be heard to complain because the prosecuting attorney and a busy trial court were no more concerned about the matter than he himself. In the case at bar the defendant, after his original motion was once overruled, apparently either entirely forgot or wholly abandoned the one strong point raised by him, and, the trial court having been given no opportunity to pass upon the matter in the light in which it is now sought to be submitted, we cannot consider the merits of appellant's contention made for the first time on appeal.

These affidavits, if taken alone at their face value, are quite formidable. Indeed, so considered, they are well calculated to cause a trial judge to wonder how in the circumstances the two *fiscals* through their combined efforts were enabled to present informations even within the six months following the arrest of defendant. The statements made therein were unchallenged by defendant and uncontradicted by anything before the trial judge at the time of his ruling on the motion. Neither the warrants of arrest copied into the motion for dismissal nor the original information nor any other paper on file at the time either specified the quantity of alcohol released in any one instance or even indicated that the Government was advised as to such amount. The

court had absolutely no data upon which to base a conclusion beyond the solemn statements so earnestly stressed under oath by the *fiscal*. The amended information, with its more illuminating details, was not filed until long afterwards. We need not discuss the affidavits. Looking at the whole matter as it was submitted to the trial judge, we cannot say that he erred in denying the motion.

Appellant presents the third and fourth assignments as follows:

"*Third Assignment of Error.*—Our exception is based upon the facts disclosed in this proceeding at different stages thereof. The record shows (R. 833 p. 16) that three charges of bribery were pending against this defendant. The bribery charges dealt with acts charged in the misdemeanors. That is to say, the accused bribed the agent (one count) to release alcohol without paying the revenue (another count). It was one transaction, the latter offense alone being a misdemeanor and the former felony.

"If the prosecution of the misdemeanor failed, still the state could proceed with the charge for bribery. But if the greater offense, which in this case undoubtedly included the latter, failed, the prosecution was at an end. Proceeding as the court did proceed by overruling the motion of the accused, the defendant was being illegally held on one charge or the other, and by ruling as the court did rule, the defendant was twice placed in jeopardy.

"(*Ex parte* Lange, 18 Wall. 163).

"*Fourth Assignment of Error.*—Our contention with reference to this assignment is essentially the counterpart of its predecessor. It must stand or fall by the same test, and for the same reason, to wit: Convicted or not convicted of the misdemeanor the state may proceed with its prosecution for bribery, the felony. But with the failure of the felony, the misdemeanor must fall. Therefore, the prosecution should have been directed to elect which charge they would proceed upon."

The case cited is not in point and the contention is without merit.

With reference to the fifth assignment, appellant says:

"The error claimed in this assignment has already been passed upon by this court in other cases, so we renew it here only to save

the point. We believe it goes both to due process and error in law.''

No reason for reconsideration being suggested, we need not review the cases referred to as decisive of the question.

The sixth and seventh assignments are based upon a further development of the keynote of defendant's brief on the first appeal; and appellant earnestly insists that, notwithstanding the strenuous efforts of counsel to impress upon the court below the true meaning and limited scope of the previous opinion of this court, and notwithstanding the elaborate precautions against possible misunderstanding expressly embodied therein, yet this dominant idea of the argument on the former hearing, the prophesied ''domination'' of the district court by the opinion of this tribunal, has become, as defendant predicted it would become, a stern reality, a condition and not a theory, an accomplished fact.

By a somewhat strained construction of the language used in the orders overruling the motions for nonsuit, appellant seeks to show that the trial court, in holding that the legal question involved had been decided by this court, simply stultified itself, washed its hands of all responsibility and in fact decided nothing at all upon its own account. It must be conceded that these orders might have been more happily worded, but we cannot admit that they are fairly open to the interpretation sought to be placed thereon by appellant.

The two entries most vigorously assailed by appellant are as follows:

''The Judge: The court understands that the legal question presented in the motion for nonsuit has been decided by the Supreme Court of Porto Rico in its decision on the appeal from the decision of this court which ruled against the prosecution in this case, and it is the duty of this court to abide by the decision of the Supreme Court. The court, therefore, denies the motion for nonsuit.

The Judge: The court overrules the motion. And in denying the motion for nonsuit, the court renders the same decision which it rendered in the first case, that is to say, in case No. 2815; that it is the understanding of the court that the legal question presented

by the defense, as a basis for the motion, has been decided by the Supreme Court in the appeal from the decision of this court in which it ruled against the prosecution in that case, and the court so renders its decision because in the opinion which the court gave in case No. 2815, and which combined itself and became part of the court's decision in case No. 2814, the court said 'that the testimony of Agent Vázquez showed that he gave the opportunity to the defendant to commit the offense, and to that end he lent his aid, without which the commission of the offense could never have been accomplished, and that he did so in order to catch the accused in the act (*in fraganti*) and denounce him before the tribunals; the act of consenting to open the deposits or tanks was to encourage the accused in the commission of the fraud.' And at the conclusion of its opinion this court stated: 'The court affirms that when the commission of an offense by a person depends absolutely upon the act of another person who is an agent of the authorities, and the latter consents to the commission of the offense with the intention of proceeding criminally against such person, the law does not permit that the act so committed be considered a public offense.'

"This opinion was before the Supreme Court and was studied by said tribunal, and the same facts clearly appeared in the amended accusation which had been ruled against by this court, and then the Supreme Court resolved that 'the information on its face, from beginning to end, clearly, distinctly and consistently negatives, contradicts and denies the theory that the revenue agent, Vázquez, tempted, encouraged, solicited, urged, induced, or instigated the defendant in any manner, shape, or form, to the commission of any criminal act.' In view of this, the court is of the opinion that the legal question has been decided by the Supreme Court, and it therefore proceeds, as is its duty, to thus render its decision."

Defendant, appellee on the former appeal, freely admitted all that this court then held, to wit, that the amended information in one of these cases states facts sufficient to constitute a crime and contains no matter which, if true, would excuse or justify the facts charged, or raise any legal bar to the prosecution. In so holding we reversed a ruling of the court below. It seems reasonably clear that we failed thoroughly to convince the district court of its error or of the soundness of our own conclusion. That is about the most that can be

said in favor of appellant's interpretation of the language of the rulings assigned as error.

If the court below accepted as true the testimony for the prosecution, as evidently it did, if we consider the evidence in the light of the theory upon which these cases were tried, as we must (2 R. C. L. p. 79, § 55; id. p. 183, § 156), and if, as from such view-point rather seems to have happened in the cases at bar, the *fiscal* merely proved the facts charged in the amended information, then there was neither error nor impropriety in stating, as the trial judge in substance did state, that this court having passed upon the legal question involved it was the duty of the trial court to apply the law as announced on the former appeal to the facts established by the evidence on the trial, regardless of, but without necessarily surrendering, whatever private and personal opinion the trial judge might entertain as to the soundness of the decision thus followed by him.

The argument under the eighth assignment involves two false premises, to wit, first, that Vázquez was an accomplice, and, second, that the check offered in evidence was in corroboration of accomplice's testimony. Neither assumption is sustained by the record. The check drawn by Vázquez in favor of the Treasurer of Porto Rico covering money said by Vázquez to have been received by him from Fajardo and deposited in the bank, was pertinent as a circumstance shedding light upon the motive and purpose which prompted his actions in the early stages of these cases and, therefore, tending to establish his legal status as an official government agent, informer or detective, rather than an accomplice. "It is too late in the world's history to question the veracity of men simply because they do unpopular things which we disapprove." And "In conclusion, questions of this class depend more on the good sense of judge and jury, in the varying circumstances of cases, than upon absolute rules of law." 2 Bishop, New Criminal Procedure, pp. 1000, 1001, sections 1174, 1176.

It is expressly admitted that the tenth and eleventh assignments are merely formal and must stand or fall with the others.

In the interest of brevity we quote the principal proposition under the ninth assignment as stated in outline by way of preface to the extended argument of appellant as to the ever recrudescent trap feature of these cases.

"This is not a case of a trap by a detective. It is a case of a public official, who, if everything he says is true, succeeded in aiding and abetting the commission of a crime on the part of a private citizen by committing a crime himself. This action, we submit, the law does not permit, but has through its most distinguished representatives on the bench, unreservedly condemned similar acts on the part of government officials to assist, induce or entrap citizens into the commission of crime. We have been unable to find a case in which such action has been permitted to stand; the officer may discover a criminal, but not create one by participating in the crime himself; in reviewing the cases we ask this court to bear in mind this pregnant fact: The appellant could not alone commit the offense charged. The officer must draw the liquor, and it cannot be released without the cancellation of the corresponding stamps, except the cancellation be by the officer himself, as all of the power is vested in his own hands.

"Before taking up the authorities, let us ascertain from his own lips the basis upon which the revenue agent acted. The information says:

" 'That said quantity of alcoholic spirits was then and there extracted by Félix Vázquez by order and direction and obeying the urging of said Mateo Fajardo Cardona.'

"And in the same information it is charged that 'the said Félix Vázquez was acting in his character as internal-revenue agent, duly appointed and under the instructions of his superiors, feigned to acquiesce with the petition and proposition of the accused, and acted at the time and place above stated with the purpose of obtaining evidence in order to prosecute criminally the accused, for the violation of the law which the accused had himself proposed and wished to violate, etc.' (Record p. ___)

"Speaking of his action in the premises in the case 2815 (appendix p. ___) the witness Vázquez was asked this question as to why he participated in the frauds charged:

" 'Q. Did you do that of your own free will?

" 'A. No, sir, in accordance with instructions received from the Treasurer of Porto Rico and the Attorney General.'

"And in the case 850, now before this court and in answer to the same question in substance, the witness says:

" '*Que tenía instrucciones de conseguir toda la evidencia necesaria en un caso de estos.*' (Record p. 47.)

" 'That he had instructions to obtain all the evidence necessary in one of these cases.'

"In view of these utterances, what becomes of the charge made in this information to the effect that the witness proceeded because of the solicitation and under the 'orders' of the appellant?

"The above disposes of the proposition, by its destruction, that the alleged offense, if committed at all, was committed for any reason or purpose except by the agent, under the instructions of his superiors, for the purpose of aiding and abetting the accused as a basis of prosecution. In other words, it was one of the official traps which the law has repudiated."

We think no argument is required to show that the isolated extract from the testimony of Vázquez, if considered in the light of all the testimony in any one of these cases, falls far short of the destructive effect claimed for it and in fact utterly fails to establish any appreciable distinction between the facts stated in the amended information, admitted by appellant, appellee in the former hearing, to be sufficient, and the facts proven on the trial. We need not dwell, therefore, upon the dire necessity by which appellant, in his effort to draw such distinction, is driven to select an isolated "trap" question on cross-examination and the answer thereto from the stenographic record of the case in which he was first tried and acquitted,—testimony which is neither now nor ever has been properly before this court. And even the apparent inconsistency sought to be shown by contrasting the statement of Vázquez in case No. 850, now before us, with the quotation from his testimony in case No. 2815, not before us, as to the nature of the instructions given him, vanishes with a glance at the preceding question and answer, to the subject-matter whereof express reference is made in the very

catch question propounded by appellant. We quote from the appendix of appellant's brief:

"Q. How did you permit this alcohol to be released from the distillery?

"A. In accordance with the instructions received from the office of the Treasurer.

"Continuing the witness said: I was instructed to permit Mr. Fajardo to draw out some alcohol without complying with the law if he earnestly desired to do so and in this case to secure all possible information to act against him. The Attorney General and the Treasurer instructed me to this effect. I received the first instructions before the release of the alcohol, after having reported about the matter. They told me to make the extraction, to get the money and deliver it. These were the instructions from the Treasurer and the Attorney General of Porto Rico. Other instructions were given subsequently.

"Q. Did you do that of your own free will?

"A. No, sir, in accordance with instructions received from the Treasurer of Porto Rico and the Attorney General.

"Continuing: The person who draws the alcohol is the owner of the distillery and the agent of the internal revenue holds the key. The owner of the distillery cannot give permission to release the alcohol.

### "RE-DIRECT EXAMINATION.

"Q. You have said that after many entreaties of the defendant you informed the proper authorities concerning what he expected to do.

"A. Yes, sir.

"Q. Explain these entreaties.

"A. I saw him before the fifth in the distillery and talking about this matter he told me there was some probability for me to earn some money.

"Q. Did he talk over this matter one or more times?

"A. Then on the fifth he was at the distillery and told me he was ready for the business and was preparing for an extraction on the ninth. I accepted then."

And here also the groundwork of appellant's theory is built upon the sand. Vázquez did not fail to pay taxes. He owed no taxes. He was under no statutory duty to do and

therefore did not fail to do any one of the acts or things the doing of which was by law expressly made the duty of defendant, whose omission to perform such obligation is the gist of the crime. The revenue agent neither committed any crime nor created a criminal. He merely pretended to acquiesce in the scheme proposed by defendant and permitted defendent to do what he voluntarily had planned and wanted to do. There was no concoction, instigation, inducement or invitation upon the part of the Government or any of its agents, but defendant entirely upon his own initiative suggested, repeatedly proposed, and, most unfortunately for him, insisted upon the establishment with the prosecuting witness, Vázquez, of the same relations represented by defendant to have been maintained by him with former revenue agents stationed at Mayagüez, and the continued operation of the same system of defrauding the Government in which defendant freely confessed he had been engaged in connivance with such former agents.

It is not necessarily true that "appellant could not alone commit the offense charged." He might have tapped the pipe through which the distilled spirits flow into the reservoir, or otherwise diverted a portion of the output. He might have constructed a concealed trap-door in the floor of the building. He might have obtained duplicate keys to fit the padlocks on the warehouse and tanks. He might have forged or stolen or obtained at reduced rates from some dishonest government official the stamps to be affixed to the invoices. He might have devised other more ingenious and less obvious methods. But that is not important. He could not have committed the crime in the way he chose to commit it and in fact did commit it in these particular cases without either the actual or pretended consent and acquiescence of the Government agent. That is equally true in the vast majority of cases in which the furnishing of a desired, solicited or necessary opportunity and the facilitating of the commission of an offense originated, designed and in fact

consummated by the defendant, have been held by the courts to be a fair and legitimate means of securing evidence for the prosecution and conviction of criminals.

Sections 21, 22 and 23 of the Treasury Regulations prescribing the method of payment of the taxes on distilled spirits, as we have already stated, are set forth in *People* v. *Fajardo,* 21 P. R. R. 452. The method therein outlined was the method pursued in these cases in so far as described in detail by the chief prosecuting witness as to the tax-paid alcohol released in each instance. Indeed, even as to the liquor upon which no tax was paid the prosecuting attorneys, in their effort by an amended information to challenge and test the views of the trial judge as evinced by his action in acquitting the defendant in the case first tried, seem to have gone somewhat further than required or justified by the actual facts involved, in charging "that the said quantity of alcoholic spirits was then and there extracted by Félix Vázquez, by order and direction and obeying the urging of said Mateo Fajardo Cardona." Defendant himself, or his agents and employees, removed the alcohol on which no tax was paid as well as that upon which he paid the tax. It was likewise the defendant, not the agent, who deliberately and wilfully failed to make out the invoices, purchase, affix and cancel the stamps, and forward the evidence of such payment to the Treasurer as required of him, not of the revenue agent, by law and the regulations. He alone did and performed every act of commission and omission necessary to constitute the crime with which he was charged, which is not the unlawful removal of the padlocks from the warehouse and tanks, but the failure to pay taxes upon specific quantities of alcohol removed by him from the factory prior to such removal.

But even in larceny, where consent is an element, the laying of a trap by the owner of the property is not always a defense; and there is at least very eminent and respectable authority to support the view that in burglary the mere fact that a servant, acting under instructions from the owner of

the building, but also at the instance of the perpetrators of the crime, facilitates their entrance by opening a door does not necessarily relieve them of responsibility.

"1. *Watching—Plans to entrap.*—If a man suspects that an offence is to be committed, and instead of taking precautions against it sets a watch and detects and arrests the offenders, he does not thereby consent to their conduct, or furnish them any excuse. And it is not ordinarily otherwise though the watching is accompanied by artifice. Thus—

"2. *In Larceny*—exposing property or neglecting to protect it, under the expectation that a thief will take it, or furnishing any other facilities or temptations to such or any other wrongdoer, is not a consent in law.

"3. *Burglary*—furnishes a frequent illustration, in cases where those intending to break into a house and steal tempt the occupant's servant to assist them; and after communicating the facts to his master, he is authorized to join them in appearance. ' For what the burglars personally do under such an arrangement, they are by all opinions responsible; but the English doctrine seems to be that if the servant opens the door while they enter, they are not guilty of a breaking. In principle, probably they are not so if the servant is to be deemed the master's agent not theirs, in opening the door. *But as they had requested him to join them, and the master's consent was merely for their detection, the better view would appear to be to consider him their agent in the breaking, and hold them responsible for it.*" (Italics ours). 1 Bishop's New Criminal Law, p. 142, section 262.

See also *People* v. *Smith,* 251 Ill. 185, 95 N. E. 1041; *State* v. *Smith,* 33 Nev. 438, 117 Pac. 19; and *Rex* v. *Chandler* (1913), 1 K. B. 125,—all of which are quoted in the note to *Kemp* v. *United States,* 51 L. R. A. (N. S.) 825, at pages 827 and 828,—and other cases cited in the note to *State* v. *Smith,* 30 L. R. A. (N. S.) 946, at pages 950 and 951.

The facts in the cases at bar do not require an exhaustive analysis of the law applicable thereto or any extended sifting of authorities with a view to the drawing of nice distinctions. If we take the testimony for the prosecution as true, as in the absence of any manifest error upon the part of the trial

court in finding defendant guilty we are bound to do, these cases fall so clearly and squarely within the general principles laid down by the overwhelming weight of authority that we shall simply quote a few paragraphs from elementary sources:

"That a man was entrapped in the commission of a crime is no defense—

"1. Unless the circumstances show consent on part of the person injured, and want of consent is an essential element of the crime.

"2. Or, perhaps, unless the commission of the act was induced by active co-operation and instigation on the part of the public authorities.

"*Mere Entrapment.*—If a man is suspected of an intention to commit a crime, neither the individual against whom his act is to be directed nor the public authorities are bound to take steps to prevent its commission. They may set a trap for the suspect, and, if he commits the crime, and is indicted, it will ordinarily be no defense that he was entrapped.

    *     *     *     *     *     *     *

"It must appear, however, that the person charged himself did everything necessary to make out a complete offense; and if there is something more than mere entrapment, it may prevent the act of the suspect from being punishable.

    *     *     *     *     *     *     *

"In order that consent may be a defense in such cases, it must be given by some one having authority to consent to the particular act.   *   *   *.

"Even in the case of crimes in which want of consent is not an essential element, a person who is entrapped into committing them should not always be punished. Public sentiment, as well as the leaning of the courts, is strongly against the practice of entrapping persons into the commission of crimes by the common detective methods. The practice has frequently been condemned by the courts, and there are reported cases in which it has been held, independently of any question of consent on the part of the person injured, that a criminal act may not be punishable if the accused was induced to commit it by active co-operation and instigation on the part of public detectives." The Law of Crimes, Clark & Marshall (2d ed.), p. 222, 224, 226, §§ 160, 161, 162.

"When a person, or those officers of the law who are charged with its enforcement, have reason to believe that a crime is about to be committed or attempted, there is nothing legally or morally wrong in laying a trap, setting out a decoy, or placing a detective in observation, or in entering into a conspiracy with others, to detect and punish the offenders; and the waylaying and watching to detect the commission of crime by the prosecutor or witnesses, in order to obtain evidence with which to convict, will not constitute a defense in a prosecution for the commission of the crime or offense.

"1. The law as to detectives and decoys may be thus noted: When to the constitution of an offense it is necessary that it should be committed without the consent of the party assailed, it is no defense that opportunities for the consummation of the offense were offered by government or by prosecution. * * *.

"2. The employment by the government of a detective in the guise of a confederate, does not preclude a prosecution in cases where the detective does not make himself apparent principal in the crime. A distinction is here made between the detective and the decoy. *The detective discloses*, it may be often by the agency of the criminals themselves, who are led to expose themselves unguardedly, *a crime already concocted; the decoy suggests the crime and is herein its originator*. It is true that all detectives are in one sense decoys, and all decoys are in one sense detectives. But *when the decoy ceases to be detective*, and becomes the *apparent originator* of the crime, then one of two consequences follows. If he was not employed by the government, then he becomes a co-conspirator liable to the same punishment as his associates, on the same principle as that which makes a person who appropriates lost property for the purpose of getting a reward indictable for larceny. If, on the other hand, he was employed by the government, *to cause the offense to be committed*, the government is precluded from asking that the offenders thus decoyed should be convicted. They are associates with the government in the commission of the crime, and the offense being joint, the prosecution must fail. If that which one principal does is not a crime, the other principal cannot be convicted for aiding him. '

"3. Detectives, whose office is limited to that of observing a crime when in the process of concoction, or of exploring its causes when consummated, *and who have not instigated it or encouraged it, except so far as is necessary, in order to be able to report its character*, are public agents entitled, when acting bona fide and discretely, to confidence and support. It is true that allowance is to be made for that

zeal which leads officers of this class sometimes to attach undue importance to supposed signs of crime. It is important, also, that their testimony should, as far as possible, be corroborated. But the *mere presence and apparent approval* of a policeman is no defense where there is *no authoritative instigation of the offense* by the government, nor *a fortiori* is the presence and apparent approval of a disguised detective, not recognized as such by the offender, appointed to act as such by the government or the parties endangered.'' (Italics ours.) 1 Wharton's Criminal Law, 11th edition, p. 229, 230, 231, 232, § 190.

''Most crimes involve in their commission a trespass to person or property, and the question has been raised whether the consent of the persons affected will relieve of criminality an otherwise criminal act. Theoretically, the question is easy to answer. If the doing of a particular act is a crime regardless of the consent of anyone, then of course consent is no excuse. Instances of crimes of this character are homicide, statutory rape, abortion, bribery, unlicensed sales of intoxicating liquors, stealing public records, taking letters or other matter from the United States mails, and practicing without a license a profession or occupation for which a license is required. On the other hand, if want of consent is an element of a crime, it is equally clear that an act done with the consent of the person affected cannot be made the basis of a criminal charge.

\*          \*          \*          \*          \*          \*          \*

''*Pretended Co-operation with Criminal.*—A situation sometimes presented is where the defendant, intending to commit a crime, e. g., burglary, proposes to a third person to assist in it, and he, seeking to decoy the defendant and secure his conviction, assents to the scheme and assists in carrying it out after notifying the authorities. In such a case the defendant cannot be convicted unless he does or participates in all the acts necessary to constitute the crime. The principle here involved is that the defendant cannot be charged with any act done by the decoy, because the decoy has no criminal intent.

''*Entrapping Suspected Criminals.*—In view of the well known facts that criminals usually work in secrecy and that some unlawful practices are encouraged and protected by a large class of citizens, it often becomes necessary to resort to various artifices in order to enforce the law and punish its violation. It has been stated in the immediately preceding paragraphs that it is not ordinarily permissible for any person, in order to secure the conviction of another on a criminal charge, to procure him to do the act. But there is a very

clear distinction between inducing a person to do an unlawful act, and setting a trap to catch him in the execution of criminal designs of his own conception. It may therefore be stated as a general rule, in regard to offenses affecting particular individuals, that if the criminal design originated with the perpetrator of the act he cannot escape conviction merely by reason of the fact that the person affected laid a trap or facilitated the execution of the scheme, or that his agents appeared to co-operate with the perpetrator in order that he might be detected in the act. One who knows of the crime contemplated against him may remain silent and permit matters to go on, for the purpose of apprehending the criminal, without being held to have assented to the act; for the consent which will relieve an act of its criminal character is something different from mere passive submission without any previous understanding with the criminal. The same rule applies to police officers. It is their duty to bring offenders to justice as well as to prevent crime, and they may permit a criminal to carry out his known designs in order to make a case against him, but they cannot procure a person to commit a crime and then obtain his conviction." * * *. 8 R. C. L. pp. 126, 127, 128 §§ 101, 104, 105.

"While the true line of distinction is not as clearly marked as it might be, and there are cases in which it seems to have been lost sight of entirely so that the decision is apparently on the wrong side, the following propositions are fairly well sustained by the decided cases:

"1. If the criminal design originates with the accused and the intended victim does not actively urge him on to the commission of the crime, the mere fact that he facilitates the execution of the scheme, and that his agents appear to co-operate in its execution will be no defense to the accused. * * *.

"2. If the design is originated by the one who apparently becomes the victim or by his agent, and is suggested to the accused and merely adopted by him, he cannot be convicted.

"As part of this rule it may be stated further that to convict the accused he must himself have done all that was necessary to constitute the offense. He cannot be made answerable for acts of the agent of the victim.

"So when the commission of the offense is procured by the prosecutor for some purposes of his own there would seem to be no ground for holding the accused guilty, and such is the rule where the offense can in a sense be regarded as committed against the prosecutor and absence of his consent is a necessary element of the crime.

"But there is a class of cases in which the commission of the offense is solicited for the express purpose of furnishing cause for prosecution in which the fact of solicitation is held to be no defense. These cases seem to embrace offenses which may be regarded as more against the public generally than against the prosecutor." Note to *Connor* v. *People*, 25 L. R. A. 341.

It will be observed that to a large extent we have put out of view the class of cases last above mentioned, although in many of them such as, for instance, those involving the taking of decoy letters, there is nothing more than a facilitating of the commission of the offense.

Thus in *Scott* v. *United States*, 172 U. S. 343, the Supreme Court quotes from the opinion in *Goode* v. *United States*, 159 U. S. 663, as follows:

"It makes no difference, with respect to the duty of the carrier, whether the letter be genuine or a decoy, with a fictitious address. Coming into his possession, as such carrier it is his duty to treat it for what it appears to be on its face—a genuine communication; to make an effort to deliver it, or, if the address be not upon his route, to hand it to the proper carrier, or put it into the list box. Certainly he has no more right to appropriate it to himself than he would have if it were a genuine letter. For the purposes of these sections a letter is a writing or document, which bears the outward semblance of a genuine communication, and comes into the possession of the employé in the regular course of his official business. His duties in respect to it are not relaxed by the fact or by his knowledge that it is not what it purports to be—in other words, it is not for him to judge of its genuineness."

The opinion in the Scott case then concludes thus:

"The difficulties of detecting this kind of crime are very great, and the statute ought not to be so construed as to substantially prevent a conviction under it. A decoy letter is not subject to the criticism frequently properly made in regard to other measures sometimes resorted to, that it is placing temptation before a man and endeavoring to make him commit a crime. There is no temptation by a decoy letter. It is the same as all other letters to outward appearance, and the duty of the carrier who takes it is the same.

"The fact that it is to a fictitious person is in all probability entirely unknown to the carrier, and even if known is immaterial. Indeed, if suspected by the carrier, the suspicion would cause him to exercise particular care to ensure its safety, under the belief that it was a decoy."

We need not paraphrase such language in order to apply the same principle by analogy to the cases now before us.

We have not deemed it necessary to discuss what effect solicitation, invitation or inducement by the revenue agent might have had in these cases, because, as we have already pointed out, he did not procure the commission of the crime.

Nor have we felt constrained to consider the necessities of the Government in dealing with matters of this kind. We may note in passing, however, that, in so far as any merit can be found in the contention of appellant that the offense can only be committed in collusion with a revenue agent, and in so far as necessity can justify the relaxation or modification of a rule of law, a claim to exemption upon this ground, if urged by the Government, would seem to be entitled to as serious consideration as in most cases in which such an element has exerted a controlling influence. If the crime which by its very nature is necessarily committed in secret can only be committed through connivance with a dishonest revenue agent, then the opportunity of the Government for enforcing the law is reduced to the very remote possibility of convicting one of the guilty parties upon the testimony of the other. It follows, for what it is worth, that if the Government cannot do what it has done in these cases, the law penalizing the failure to pay taxes on distilled spirits prior to removal thereof from the factory would become a mere dead letter upon the statute book, and the Government and its revenues would be left helpless in the hands of dishonest distillers and corrupt or weak and easily influenced agents. Such a situation would place a premium on dishonesty at the expense of the Insular revenues and of such distillers as might either voluntarily elect to pay taxes or else be obliged

thereto by the unswerving devotion to duty of an honest and incorruptible revenue agent.

Also, while we have preferred to treat this question very much as though the Government were a private individual and the crime were one which involved the element of consent upon the part of the victim, yet we would not be understood as holding that either the Attorney General or the Treasurer or any other officer of the Government may consent on behalf of the Government to the commission of a crime against the Government. It may be that by instigation to crime they might preclude the prosecution of an offense the commission of which was so procured by them. That, as we have shown, is a question which is not necessarily involved herein. The offense of which defendant was convicted is a crime against the public, not against the prosecuting officers. It seems reasonably safe to say that neither the revenue agent nor the Treasurer nor the Attorney General, had they in fact consented to and acquiesced in the commission of the offense by the defendant, which they did not do, could thus tie the hands of the Government or grant absolution to the defendant for his crime against the public. To state the proposition is to refute it.

Defendant by his own statement, if the testimony of Vázquez be true, for some time had been defrauding the Government of taxes. The Government, suspecting that frauds were being committed, sent a trustworthy agent to Mayagüez to investigate. He was promptly approached by defendant and pretended to yield to the influence thus brought to bear upon him. Defendant supposed that he had both the consent and the acquiescence of Vázquez; but he did not understand either that the Government had agreed to a rebate or that the money paid to Vázquez was in settlement with the Government for taxes due. He knew that the revenue agent could not serve two masters. He believed that Vázquez had betrayed his official trust. In this defendant relied upon the frailty of human nature and upon his experienced judgment

thereof. He was no stranger to the risk he ran that the man whom he thought willing to allow him for a consideration to defraud the Government, either from higher motives or out of a selfish hope for future advancement or even prompted by some more sinister impulse, might deliver him into the grasp of the law. He chose to take this chance, and deliberately violated the statute. The facts disclose not so much a Government trap. as the skilful unmasking of a scheme to defraud the Government of its revenues,

> "And, in this upshot, purposes mistook
> Fall'n on the inventor's head."

The rest of appellant's argument under the ninth assignment is devoted entirely to the conflict between the testimony for the prosecution and that adduced by the defense. As we have already pointed out, the trial court chose to believe the witnesses for the Government. There is no definite charge of passion or prejudice and we cannot say that the court below committed any such manifest error in this regard as to require a reversal.

We purposely abstain from the discussion of any question as to the sufficiency of the evidence not raised by the parties in the court below nor suggested by either of them on appeal.

The judgments must be

*Affirmed.*

Chief Justice Hernández and Justices Wolf, del Toro and Aldrey concurred.